Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/05/2021 09:08 AM CST

State of Nebraska, appellee, v.
Chantell Walker, appellant.

___ N.W.2d ___

Filed December 22, 2020.    No. A-19-1026.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

2. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

3. **Rules of Evidence: Hearsay: Appeal and Error.** Excluding rulings under the residual hearsay exception, an appellate court reviews the factual findings underpinning a trial court's hearsay ruling for clear error and reviews de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds.

4. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

5. **Criminal Law: Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

6. **Evidence: Records: Hearsay: Proof.** The party seeking to admit a business record under the business records exception to the hearsay rule bears the burden of establishing foundation under a three-part test. First, the proponent must establish that the activity recorded is of a type

that regularly occurs in the course of the business' day-to-day activities. Second, the proponent must establish that the record was made as part of a regular business practice at or near the time of the event recorded. Third, the proponent must authenticate the record by a custodian or other qualified witness.

7. **Evidence: Records: Hearsay.** Firsthand knowledge of the actual recording is not a foundational step to qualifying the record as a business record, and any lack of firsthand knowledge on the part of the custodian or other witness who lays foundation for the document goes simply to its weight.

8. **Evidence: Words and Phrases.** Unfair prejudice means an undue tendency to suggest a decision based on an improper basis. It speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.

Appeal from the District Court for Douglas County: Kimberly Miller Pankonin, Judge. Affirmed in part, and in part vacated and remanded for resentencing.

Thomas C. Riley, Douglas County Public Defender, Lori A. Hoetger, and Megan E. Jeffrey for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Moore, Bishop, and Welch, Judges.

Welch, Judge.

## I. INTRODUCTION

Chantell Walker was convicted by a jury of theft by deception in the amount of $1,500 to $5,000. Walker argues the district court erred in admitting into evidence U.S. Department of the Treasury payment records (exhibits 14 through 20), a redetermination summary (exhibit 5), and a September 2018 "ruse" interview (exhibit 1). She also contends that the evidence was insufficient to support her conviction. For the reasons set forth herein, we affirm Walker's conviction but vacate Walker's sentence and remand the cause for resentencing.

## II. STATEMENT OF FACTS

### 1. Charges

In December 2018, the State charged Walker with theft by deception in the amount of $1,500 to $5,000, a Class IV felony. See Neb. Rev. Stat. §§ 28-512 and 28-518 (Reissue 2016). The information alleged that from October 1, 2015, to March 31, 2016, Walker obtained by deception, through her disabled daughter, between $1,500 and $5,000 of benefits from the Social Security Administration (SSA).

### 2. Pretrial Proceedings

Prior to trial, Walker filed motions in limine seeking to exclude certain pieces of the State's evidence. Specifically, Walker sought to exclude an audio recording of a September 2018 "ruse" interview with Walker (exhibit 1), on the bases that it lacked relevance and that the danger of unfair prejudice outweighed its probative value. Walker also sought to exclude Department of the Treasury SSA payment records from 2015 to 2016 (exhibits 14 through 20) on the ground that the records were not timely disclosed. The district court denied both of these motions.

### 3. Trial

At the July 2019 trial, the State called two witnesses: Melissa Duesman, a technical expert employed by the SSA, and Matthew Chadderdon, a special agent employed by the Office of the Inspector General for the SSA. The State also introduced numerous exhibits into evidence.

Duesman testified that as a technical expert, she had duties including investigating fraud and misuse cases, and that in September or October 2017, she received an allegation of misuse regarding Walker's receipt of SSA income benefits for her disabled daughter on the basis that Walker's daughter was no longer in Walker's custody.

In investigating the allegation of misuse against Walker, Duesman reviewed various documents within the SSA's database, including Walker's daughter's SSA income record,

which Duesman described as "a history essentially of the filing." This document was received into evidence as exhibit 2 over Walker's foundation, hearsay, and relevancy objections. Duesman also reviewed Walker's August 2010 application to be the representative payee for supplemental SSA income benefits for Walker's disabled daughter, which application was received into evidence as exhibit 3. In the application, Walker stated that her daughter lived with her. The application set forth, in several places, the reporting responsibilities of the representative payee, including updating the SSA "when the claimant . . . leaves [the representative payee's] custody or otherwise changes his/her living arrangements." In another place, the application stated that the personal representative must notify the SSA if "the claimant MOVES or otherwise changes the place where he/she actually lives." Walker's 2010 application to be the representative payee for her disabled daughter was granted.

Duesman also reviewed an October 2015 letter that the SSA sent to Walker concerning Walker's failure to submit an accounting report for the money received from February 2014 to January 2015. Walker responded with a verification form that included a question of whether the daughter lived with Walker during the time at issue. Walker responded "no" and wrote, "As Dec. 14 I still get my daughter every weekend she goes to my sister house I proved . . . . As I been her need and want pay all phone bill c[lo]thes tran[sporta]tions need and more." Duesman also reviewed a February 2016 redetermination summary, which was received as exhibit 5 over Walker's foundation and hearsay objections. In the redetermination summary, Walker indicated her address had changed in September 2015 and January 2016, but that her daughter continued to reside with her.

Following her review of these documents, in mid-October 2017, Duesman informed Walker of the allegation that Walker had misused her daughter's SSA income benefits, on the basis that Walker's daughter had not lived with Walker during a

relevant time period, and inquired about Walker's daughter's living arrangements. In response, Walker told Duesman that from 2014 to 2016, Walker's daughter stayed with her only on the weekends. This prompted Duesman to request that Walker provide records establishing that Walker's daughter lived with Walker during the relevant time period.

After Walker failed several times to produce the requested information, in January 2018, Duesman sent a letter to Walker requesting that Walker provide a statement with proof of how the SSA benefits were used. Thereafter, in April 2018, Walker submitted a written statement that included the following responses: Walker's daughter last lived with her in 2015; Walker used the SSA benefits to pay the phone bill, "send money," buy "clothes and highgeans," and pay for a bus pass; and Walker lost a lot in a house fire. Walker's submitted statement did not include any supporting documentation to prove she used the SSA income benefits to pay the bills claimed.

(a) Exhibits 14 Through 20

During Duesman's testimony, the State also introduced into evidence various Department of the Treasury records showing SSA income benefits payments made to Walker during the relevant time period.

The following colloquy took place between the prosecutor and Duesman regarding the Department of the Treasury payment records:

Q. And Ma'am, how are payments generally distributed from the [SSA] to claimants?

A. Either by check or direct deposit.

Q. And who generally distributes them?

A. The Department of the Treasury on behalf of [the SSA].

Q. And are you aware of how the entire process works from the payment amounts stemming from the [SSA] going over to the Department of the Treasury?

A. Basic understanding, yes. We tell the treasury what to pay.

Q. And how do you tell the treasury what to pay[?]

A. It is my understanding that it is [an] interface — a computer interface.

Q. And is that just generated through a system or does somebody input those payments?

A. No, it is system generated.

Q. And then after the payment information is sent over to the Department of the Treasury, what occurs after that?

A. A deposit is made or a check is issued.

Q. A check is immediately issued from the Department of the Treasury to a claimant?

A. On the date that it is scheduled.

Q. And who schedules that date?

A. It is scheduled by [the SSA].

Q. So, [the SSA] kind of dictates the entire process, correct?

A. Yes.

Q. And then the Department of [the] Treasury simply sends out a check to whoever the claimant is or representative payee is?

A. Yes.

Q. And Ma'am, are you able to access those records at all that are under the Department of [the] Treasury?

A. Yes.

Q. And how do you have access to them?

A. Through our security clearance. We go through an additional security clearance to access Department of [the] Treasury records that are just [the SSA] records. So it would be, in this case, my ID, my PIN, my password gives me access.

Q. And Ma'am, do you access that in the normal course of your duties as an investigator for the [SSA]?

A. Yes.

Q. And did you access that in your investigation on this matter?

A. Yes.

Q. And were you able to determine payment amounts by accessing that database through the Department of the Treasury?

A. Yes.

. . . .

Q. Ma'am, I'm handing you what's been marked as Exhibit 14. Do you recognize what that document is?

A. Yes.

Q. And how do you recognize what that document is?

A. This is a print out from the Treasury check information system, that database from the Treasury.

Q. And this is that database you indicated previously you had access to, correct?

A. Yes.

At that time, the State offered exhibit 14 and Walker posed foundation and authentication objections. At a sidebar, Walker's counsel argued:

Your Honor, . . . Duesman testified that this is a database she had access to, not one that she was able to maintain or enter records into. This is a completely different department of the government. It would be fairly similar to if I was trying to say that I was the custodian of records for a print out from the court. It is just simply a different department and I may have access to those records, but that doesn't mean I can authenticate them and provide a proper foundation that they are what they say they are. And in fact, the exhibit itself at the bottom says it is from the [Department of the Treasury].

The court then asked the prosecutor if he wanted "to lay some more foundation," to which the prosecutor replied:

Your Honor, just in general at this time . . . I would like to lay some more foundation as well, but . . . Duesman also indicated how that whole process works. How the [SSA] is going to dictate the process. That the Department of [the] Treasury simply sends out the check following the scheduling that the [SSA] sends to the department at the time. She said she's able to access this database. She

accesses it through her normal course of business investigating these types of matters.

THE COURT: That's the kind of foundation I didn't hear. So, why don't you ask a few more questions[?]

The prosecutor then continued his colloquy with Duesman:

Q. Ma'am, in regards to your investigation of this matter, you stated that you were able to access this database through the Department of the Treasury, correct?

A. Yes.

Q. And you access that throughout the normal course of business conduct, correct?

A. Yes.

Q. And is that normal business [to] conduct investigations [into] fraudulent matters similar to this, correct?

A. Yes, in addition to any inquiry regarding a check from any beneficiary.

Q. So, you have immediate access to this database [whenever] you would like?

A. Every payment from [the SSA] goes through that system.

Q. And then as you previously stated, the [SSA] dictates everything other than the check being distributed to the claimant.

A. Yes, [the SSA] doesn't actually print or send the money, but yes.

Q. And the Department of [the] Treasury, that's what they do is they print and send the money and that's it?

A. They print the check and send it via the post office or send it electronically to the bank that we give them.

Q. And that's all through your direction, correct?

A. Agency direction, yes.

At that time, Duesman again identified exhibit 14 as a report documenting the amount of Walker's supplemental SSA income issued by the Department of the Treasury to Walker and obtained from the Department of the Treasury check database, which database Duesman testified she accesses in the

normal course of business to investigate fraudulent matters. However, Duesman acknowledged that she could not identify the acronyms contained in exhibit 14 and that the records are deposited, stored, and maintained by the Department of the Treasury. The Department of the Treasury records contained in exhibits 14 through 20 showed that a total of $4,118.04 had been paid to Walker over the relevant time period. These Department of the Treasury records were received into evidence as exhibits 14 through 20 over Walker's foundation and hearsay objections, as well as Walker's renewed motion in limine.

### (b) Chadderdon's Testimony

The State's second witness, Chadderdon, testified that as a special agent employed by the Office of the Inspector General for the SSA, he investigated crimes pertaining to the SSA. Chadderdon testified that he began his July 2018 investigation of Walker by reviewing pertinent SSA documents and by interviewing the custodial father of Walker's daughter. Chadderdon learned that the custodial father began receiving SSA income benefits on behalf of his and Walker's daughter in April 2016.

To gather additional information from Walker, Chadderdon conducted a "ruse" interview of Walker in September 2018. Chadderdon explained that during a "ruse" interview, he properly identifies himself but does not provide the specific purpose for the interview, which sometimes helps him obtain truthful information from a person being investigated for fraud. Chadderdon testified that he recorded the "ruse" interview of Walker at Walker's residence. The audio recording of the interview was received into evidence as exhibit 1, over Walker's relevancy and undue prejudice objections, as well as the renewal of her motion in limine. During the interview, Walker stated that when she moved to Omaha, Nebraska, in 2015, her daughter's father obtained "residential custody" of their daughter, and that their daughter had lived with him for the past 3 years.

### 4. Verdict and Sentencing

At the close of the State's evidence, Walker moved for a directed verdict, which motion was denied by the district court. Walker then rested without presenting any evidence. The jury found Walker guilty of theft by deception in the amount of $4,118.04.

At the sentencing hearing held in October 2019, Walker stipulated that if the district court placed her on probation for a period of time with a payment of $86 per month, she could pay that amount. The district court noted it had considered the information contained in the presentence investigation report and other relevant factors and sentenced Walker to 4 years of probation and to pay $4,118.04 in restitution to the SSA. Walker has timely appealed.

## III. ASSIGNMENTS OF ERROR

Walker contends the district court erred in admitting into evidence (1) the Department of the Treasury records (exhibits 14 through 20), (2) the redetermination summary (exhibit 5), and (3) the September 2018 "ruse" interview (exhibit 1). She also contends that the evidence was insufficient to support her conviction.

## IV. STANDARD OF REVIEW

[1,2] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Martinez*, 306 Neb. 516, 946 N.W.2d 445 (2020). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id*.

[3] Excluding rulings under the residual hearsay exception, an appellate court reviews the factual findings underpinning a trial court's hearsay ruling for clear error and reviews de novo the court's ultimate determination whether the court

admitted evidence over a hearsay objection or excluded evidence on hearsay grounds. See *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019).

[4,5] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Wood*, 296 Neb. 738, 895 N.W.2d 701 (2017). In reviewing a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

## V. ANALYSIS

### 1. Evidentiary Rulings
### on SSA Records

Walker first argues that the district court erred in admitting into evidence exhibits 14 through 20, which Walker claims are inadmissible hearsay. Exhibits 14 through 20 are the Department of the Treasury payment records which purport to represent the SSA income paid by the department to Walker from October 1, 2015, through March 1, 2016. The documents were offered by the State to indicate the amount of funds paid under the SSA income program to Walker from October 1, 2015, to March 1, 2016, which the State alleges were obtained by deception.

The State acknowledges that the documents are hearsay "since they were statements offered to prove the truth of the matter asserted: that certain payments were made to Walker." Brief for appellee at 11. But the State argues that pursuant to Neb. Rev. Stat. § 27-803(5) (Reissue 2016), the records are excepted from the general hearsay rule as qualifying business records. Stated differently, the State sought to admit the records from the Department of the Treasury governing

payments made to Walker under the business records exception to the hearsay rule.

[6] As the Nebraska Supreme Court held in *State v. Robinson*, 272 Neb. 582, 613-14, 724 N.W.2d 35, 64-65 (2006), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010):

> Pursuant to Neb. Evid. R. 803(5), Neb. Rev. Stat. § 27-803(5) (Cum. Supp. 2004), the following is not excluded by the hearsay rule: "A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, other than opinions or diagnoses, made at or near the time of such acts, events, or conditions, in the course of a regularly conducted activity, if it was the regular course of such activity to make such memorandum, report, record, or data compilation at the time of such act, event, or condition, or within a reasonable time thereafter, as shown by the testimony of the custodian or other qualified witness unless the source of information or method or circumstances of preparation indicate lack of trustworthiness."
>
> The party seeking to admit a business record under this exception to the hearsay rule bears the burden of establishing foundation under a three-part test. First, the proponent must establish that the activity recorded is of a type that regularly occurs in the course of the business' day-to-day activities. Second, the proponent must establish that the record was made as part of a regular business practice at or near the time of the event recorded. Third, the proponent must authenticate the record by a custodian or other qualified witness. See, *Misle v. Misle*, 247 Neb. 592, 529 N.W.2d 54 (1995); *State v. Wright*, 231 Neb. 410, 436 N.W.2d 205 (1989).

Accordingly, in order to have these records admitted under this exception, the State had the burden of laying foundation under this three-part test. Acknowledging the responsibility to do so, the State points to the testimony of Duesman, a technical expert employed by the SSA, and argues as follows:

Here, regarding Exhibits 14 through 20, the State established the applicability of the business records exception. Duesman testified that the payments were distributed by the [Department of the Treasury] on behalf of the SSA. . . . Duesman explained that she had a "basic understanding" of how that process worked, that SSA told [the Department of the Treasury] what to pay (through a computer interface) and then [it] automatically made the deposit or issued the check on the scheduled date. . . . Duesman explained further that "[e]very payment from [the SSA] goes through that system," . . . and the clear implication was that records of each payment were made at or near the time of payment. . . . Finally, although Duesman might not have been a "custodian" of the records, a custodian is not required; § 27-803(5) says that the requisite foundation may be established "by the testimony of the custodian or other qualified witness." Duesman was an "other qualified witness," as she had access to and dealt with these types of records regularly as part of her duties as a technical expert. . . . Accordingly, the State established the applicability of the business records exception and the district court therefore did not err in overruling Walker's hearsay objection.

Brief for appellee at 12-13.

Contrary to the State's argument, there is no testimony in the record from anyone which establishes that the reports offered as exhibits 14 through 20 were made as a part of a regular business practice by the Department of the Treasury at or near the time that the payments were made. In short, the State attempts to fulfill its foundation obligations here through the testimony of an SSA employee, not a Department of the Treasury employee, who stated she has "access" to the Department of the Treasury database in which the report was generated. That SSA employee, Duesman, testified she generated these reports because she has access to the Department of the Treasury database and testified to a general understanding

that the SSA database interfaces with the Department of the Treasury database. But in rendering this testimony, Duesman failed to provide specific testimony governing the second foundation requirement for the business records exception to apply; nor did she establish whether she had enough familiarity with the Department of the Treasury records to lay that foundation even if she was asked.

In arguing that Duesman was a "'qualified witness'" that had "access to and dealt with these types of records regularly as part of her duties as a technical expert," brief for appellee at 13, the State appears to be arguing for application of § 27-803(5)(b), which provides:

A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, other than opinions or diagnoses, that was received or acquired in the regular course of business by an entity from another entity and has been incorporated into and kept in the regular course of business of the receiving or acquiring entity; that the receiving or acquiring entity typically relies upon the accuracy of the contents of the memorandum, report, record, or data compilation; and that the circumstances otherwise indicate the trustworthiness of the memorandum, report, record, or data compilation, as shown by the testimony of the custodian or other qualified witness. Subdivision (5)(b) of this section shall not apply in any criminal proceeding.

Although Duesman's testimony—that as a member of the fraud unit, she has access to the Department of the Treasury database and regularly uses these reports in her analysis— might qualify as an exception to the hearsay rule under § 27-803(5)(b), this rule clearly, on its face, does not apply to criminal proceedings. Accordingly, regardless of her use of these reports in the past, the State here was required to independently establish the foundational requirements under § 27-803(5)(a) in order to qualify these reports as business records. Duesman's indication that she gained access to the

Department of the Treasury database and utilized these reports in the past does not establish the very specific foundational requirements for the business records exception to apply.

The State urges this court to consider its ruling in *State v. Ford*, 1 Neb. App. 575, 501 N.W.2d 318 (1993), and argues the facts in *Ford* are analogous to its own. In *Ford*, an employee of a hotel testified that he obtained computer-generated records which recorded the date, time, and card identification of persons obtaining access to certain hotel rooms. In holding that the employee provided sufficient foundation to admit the records under the business records exception, the court rejected the appellant's argument that the employee had an insufficient understanding of the computer's component parts or engineering, holding:

> In the case at bar, [the employee] explained how the computer system worked and testified that the computer instantaneously recorded the opening of every guestroom door on the property. Her testimony indicated that she was proficient at retrieving and printing out information stored in the computer system. [The employee's] situation is analogous to that of the records custodian in [*State v.*] *Estill*[, 13 Kan. App. 2d 111, 764 P.2d 455 (1988),] or the officer, referred to in *Estill*, who uses a radar device. The record on appeal shows that [the employee] was trained and competent in the use of the computer system. For purposes of foundation, it did not matter whether [the employee] could discuss the components or engineering principles of the computer. [The employee] was qualified to testify about the computer system and authenticate the system's printouts. The third requirement of the business records exception was satisfied.

*State v. Ford*, 1 Neb. App. at 580, 501 N.W.2d at 321. Most notably, *Ford* can be distinguished from the instant case because of the employee's testimony which established the foundational elements for the admission of the business records. That did not occur here.

We hold that the district court erred in admitting exhibits 14 through 20 following Walker's hearsay objections. We will address the impact of the court's error in admitting those exhibits in the final section of this opinion, where we discuss Walker's argument that there was insufficient evidence to support her conviction.

## 2. Evidentiary Rulings on Redetermination Summary

Walker next argues the district court erred in admitting the February 2016 redetermination summary, admitted as exhibit 5, because the State failed to lay proper foundation and the exhibit contains hearsay within hearsay. More specifically, as to foundation, Walker contends the State failed to establish the foundational requirements of the business records exception insofar as Duesman was not a custodian of records or other witness qualified to lay foundation, because she did not explain how the SSA maintains and stores records such as the February 2016 redetermination summary (exhibit 5), and as a result, exhibit 5 does not satisfy the business records exception, preventing its admissibility. As to "'[h]earsay . . . within hearsay,'" Walker argues that although a statement within the redetermination summary purports to be Walker's statement, which would be allowable under the "party-opponent exception" to the hearsay rule, Duesman could not establish Walker made the statement within the record, because she did not conduct the interview. Brief for appellant at 19. We will address these arguments separately.

First, we look to determine whether Duesman was sufficiently qualified to lay foundation for exhibit 5 under the business records exception. As to Walker's claim, Duesman, a technical expert employed by the SSA, testified to her familiarity with the report in question. She further testified that it is a common practice or activity for SSA employees to perform these "[r]edetermination reviews" in the office or by telephone; for the employees to input the questions and the

interviewee's responses into the SSA database, where they are stored; and for the employees to either print a copy of the summary of the questions and answers to give directly to the interviewee or mail a copy later. Because of her familiarity with the activity, the process, and the report, Duesman clearly represents a witness qualified to lay foundation for this record and appropriately established foundation under the three-part test we previously specified.

As to the statement of Walker herself within that report constituting hearsay within hearsay, Neb. Rev. Stat. § 27-805 (Reissue 2016) provides that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Because we have already found that the report designated as exhibit 5 was a business record excluded from the hearsay rule under § 27-803(5), we now address whether Walker's statements captured within the report are subject to another exception.

According to Neb. Rev. Stat. § 27-801(4)(b) (Reissue 2016), a statement is not hearsay if

> [t]he statement is offered against a party and is (i) his own statement, in either his individual or a representative capacity, or (ii) a statement of which he has manifested his adoption or belief in its truth, or (iii) a statement by a person authorized by him to make a statement concerning the subject, or (iv) a statement by his agent or servant within the scope of his agency or employment, or (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

(Although § 27-801 was amended in 2019, the amendment was not effective until September 1, 2019, which was after the trial in this case.)

[7] Walker acknowledged this rule and conceded it would otherwise qualify her statements as nonhearsay, but claims the rule does not apply because Duesman herself, who laid foundation for the record which includes the statement, did not

record the statement. But Walker ignores the clear language of § 27-803(5)(a), which provides in relevant part: "The circumstances of the making of such memorandum, report, record, or data compilation, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight." In other words, firsthand knowledge of the actual recording is not a foundational step to qualifying the record as a business record and any lack of firsthand knowledge on the part of the custodian or other witness who lays foundation for the document goes simply to its weight. See *Doe v. Gunny's Ltd. Partnership*, 256 Neb. 653, 663, 593 N.W.2d 284, 291 (1999) (holding "[p]ursuant to § 27-803(5), '[t]he circumstances of the making of such memorandum, report, record, or data compilation, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight'; however, such factors do not prohibit admission of the evidence").

Because the statement within the report designated as exhibit 5 qualifies as a statement of a party opponent offered against Walker under § 27-801(4)(b), the statement is not hearsay and her argument fails.

### 3. Evidentiary Rulings on "Ruse" Interview

Walker next asserts the district court erred in admitting the "ruse" interview (exhibit 1), over her relevancy objection and her claim that the exhibit was unfairly prejudicial in violation of Neb. Rev. Stat. § 27-403 (Reissue 2016). Walker argues that whether Walker's daughter lived with her in 2018 is not relevant to the allegations of Walker's theft beginning in October 2015 and was unduly prejudicial.

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Rev. Stat. § 27-401 (Reissue 2016). "Relevancy requires only that the probative value be something more than nothing." *State v.*

*Munoz*, 303 Neb. 69, 82, 927 N.W.2d 25, 36 (2019). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." § 27-403.

In *State v. Munoz,* 303 Neb. at 82, 927 N.W.2d at 36, the Nebraska Supreme Court articulated the "low bar" for establishing relevancy. In *Munoz*, the defendant was convicted of murder, and on appeal, the Nebraska Supreme Court was asked to decide whether the blood spatter evidence was relevant to the case. The Nebraska Supreme Court determined:

> The blood spatter evidence satisfied the low bar for establishing relevancy. It showed the brutal nature of [the] death, which was consistent with the State's theory that [the defendant] believed [the victim] was "cheating on" him and "react[ed] violently." This alone satisfies the minimal requirement that the probative value of the evidence be something more than nothing.

*Id.* at 82-83, 927 N.W.2d at 36-37.

Here, the "ruse" interview contained Walker's statements that the father obtained custody of Walker's daughter when Walker moved to Omaha in 2015 and that Walker's daughter lived with the father for the past 3 years. Walker's statements in the "ruse" interview contradict the information she submitted to the SSA in exhibit 5, the redetermination summary. Accordingly, the "ruse" interview is relevant because it is consistent with the State's theory that Walker failed to inform the SSA of her daughter's living arrangements, which failure resulted in the SSA's providing Walker with SSA income benefits. Therefore, the district court did not err in overruling Walker's relevance objection.

[8] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time,

or needless presentation of cumulative evidence." § 27-403. "Unfair prejudice means an undue tendency to suggest a decision based on an improper basis. It speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis." *State v. Munoz*, 303 Neb. at 83, 927 N.W.2d at 37. As explained previously, the "ruse" interview contained Walker's statements that her daughter lived with the father, which were inconsistent with the information she provided to the SSA. Although this evidence was prejudicial to Walker, it was not unfairly prejudicial, as its relevancy most certainly outweighed any concern that the information provided might lead to a finding of guilt on a different ground. Accordingly, the district court did not err in overruling Walker's objection; we find no merit to this assigned error.

### 4. INSUFFICIENCY OF EVIDENCE

Lastly, Walker contends that the evidence was insufficient to support her conviction. Specifically, she argues the State failed to establish that Walker reinforced or created a false impression which "induced the SSA to part with [its] property." Brief for appellant at 23.

Walker was convicted of theft by deception in the amount of $1,500 to $5,000, pursuant to § 28-512 and to § 28-518. Section 28-518(2) provides that "[t]heft constitutes a Class IV felony when the value of the thing involved is one thousand five hundred dollars or more but less than five thousand dollars." The relevant portion of § 28-512 states:

A person commits theft if he obtains property of another by deception. A person deceives if he intentionally:

(1) Creates or reinforces a false impression, including false impressions as to law, value, intention, or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise; or

(2) Prevents another from acquiring information which would affect his judgment of a transaction; or

(3) Fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship[.]

The record established that in 2010, when Walker applied to be her daughter's representative payee, she indicated that her daughter lived with her. Part of the application included a statement notifying Walker that she was required to notify the SSA of the occurrence of certain events including "when the claimant . . . leaves [the representative payee's] custody or otherwise changes his/her living arrangements." In another place, the application stated that the personal representative must notify SSA if "the claimant MOVES or otherwise changes the place where he/she actually lives." The State then offered evidence which indicated Walters was made her disabled daughter's SSA benefit payee on the basis of these specific representations. Although Walker informed the SSA that her daughter did not live with her from February 1, 2014, to January 31, 2015, in February 2016, Walker indicated her address had changed in September 2015 and January 2016, but noted her daughter continued to live with her.

In October 2017, Walker informed Duesman that from 2014 to 2016, Walker's daughter stayed with her only on the weekends. Walker made similar statements during the September 2018 "ruse" interview, including that when Walker moved to Omaha in September 2015, her daughter's father obtained "residential custody" of their daughter, who had lived with him for the past 3 years. It is clear from the record that Walker's daughter's living and custodial arrangements changed for the time period relevant to the State's charge, but that Walker did not inform the SSA as required. This resulted in Walker's continuing to receive SSA income benefits as her daughter's representative payee on the basis of a false impression. Further, notwithstanding the SSA's request that

Walker submit proof that she used SSA income benefits paid to her from September 2015 through March 2016 on behalf of her disabled daughter, Walker failed to do so. This evidence further corroborates that the benefits paid to Walker for the benefit of her daughter were not used for her daughter, which reinforces she created a false impression with the SSA that she was receiving those benefits on her disabled daughter's behalf. Walker's April 2018 submitted statement did not include any supporting documentation to prove she used the SSA benefits to pay the bills claimed.

Notwithstanding the above, without the benefit of exhibits 14 through 20 in the record, which we have determined were erroneously received into evidence by the district court, the State failed to prove the exact amount of benefits paid to Walker within the relevant timeframe. In fact, Duesman testified that she established the amount paid by the Department of the Treasury to Walker only by reviewing those documents. Although certain admissions by Walker in the record establish that she received some value in the relevant timeframe, the State has failed to prove how much.

The State charged Walker with theft by deception, in violation of § 28-512. Specifically, the State sought to grade Walker's theft under § 28-518(2), which provides that "[t]heft constitutes a Class IV felony when the value of the thing involved is one thousand five hundred dollars or more but less than five thousand dollars." Further, § 28-518(8) provides that "[i]n any prosecution for theft under sections 28-509 to 28-518, value shall be an essential element of the offense that must be proved beyond a reasonable doubt."

Here, as explained above, the State successfully proved the elements of § 28-512 and proved that Walker obtained value for her deception, albeit having failed to prove the specific amount of value because of our ruling governing exhibits 14 through 20.

A similar scenario occurred in *State v. Gartner*, 263 Neb. 153, 638 N.W.2d 849 (2002), wherein the State successfully

proved the elements of a theft charge; however, in attempting to prove the value of one of the items of property stolen (a fax machine), the State provided inadmissible evidence to support the actual value of the property, thus failing to satisfy its burden to support a gradation of the theft as a Class IV felony. As a result, the Nebraska Supreme Court held:

> In the instant case, while the State failed to present evidence sufficient to support the jury's conclusion regarding the $525 value of the fax machine at the time of the theft, the evidence does establish beyond a reasonable doubt that the fax machine had some intrinsic value that translated to at least nominal market value at the time of the theft. Compare *State v. Garza*, 241 Neb. 256, 487 N.W.2d 551 (1992)[, *disapproved on other grounds, State v. Dixon*, 306 Neb. 853, 947 N.W.2d 563 (2020)]. Consequently, the evidence is sufficient to support [the defendant's] conviction for theft. However, because the evidence of specific value at the time of the theft is not sufficient to support the gradation of the theft as a Class IV felony, [the defendant's] sentence on count VII must be vacated, and the cause remanded for imposition of an appropriate sentence for a Class II misdemeanor, pursuant to § 28-518(4). See *Garza, supra.*

*State v. Gartner*, 263 Neb. at 170, 638 N.W.2d at 863.

We likewise vacate Walker's sentence here and remand the cause for imposition of an appropriate sentence for a Class II misdemeanor. See § 28-518(4).

## VI. CONCLUSION

For the foregoing reasons, we affirm Walker's conviction and vacate Walker's sentence and remand the cause for resentencing.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED FOR RESENTENCING.