IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


WAUGH V. MCMANUS


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


CALEB J. WAUGH, APPELLANT,

V.

TAYLOR L. MCMANUS, APPELLEE.


Filed June 2, 2026.    No. A-25-723.


Appeal from the District Court for Buffalo County: JOHN H. MARSH, Judge. Affirmed.

Bergan E. Schumacher, of Bruner Frank Schumacher Husak Simpson, L.L.C., for appellant.

No appearance for appellee.


MOORE, PIRTLE, and WELCH, Judges.

MOORE, Judge.

## I. INTRODUCTION

Caleb J. Waugh appeals from the order of modification entered by the district court for Buffalo County in this paternity action between Waugh and Taylor L. McManus. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. PATERNITY DECREE

Waugh and McManus are the parents of Layla, born in 2018. The parties were not married but resided together for some time after Layla's birth before separating.

On April 19, 2019, the district court entered a decree of paternity, custody, and support. Pursuant to the parties' stipulation, the court awarded Waugh and McManus joint legal and physical custody of Layla. Waugh had parenting time every Sunday commencing at 10 a.m. and

concluding the following Wednesday at 10 a.m., in addition to every other weekend from Friday at 10 a.m. until Sunday at 10 a.m. McManus had parenting time every Wednesday commencing at 10 a.m. and concluding the following Friday at 10 a.m., in addition to every other weekend from Friday at 10 a.m. until Sunday at 10 a.m.

The parenting plan included provisions restricting McManus' mother, Angela, from being "around the child," as well prohibiting either parties' use or possession of controlled substances during parenting time. Neither party was ordered to pay monthly child support. "Out of pocket medical expenses" not covered by insurance and childcare expenses were split evenly between the parties.

## 2. MODIFICATION PROCEEDINGS

In July 2024, the State filed a complaint seeking to require Waugh to pay child support due to Layla's receipt of public assistance.

Waugh then filed an answer and counter complaint alleging material changes in circumstances, including that McManus had failed to provide Layla with stability; McManus lacked reliable transportation; McManus had failed to adequately provide for Layla's education, safety, welfare and overall wellbeing; McManus had not met Layla's financial needs and had failed to pay for her share of medical and daycare expenses incurred; and McManus had failed to abide by the parenting plan that was previously agreed upon by the parties. Waugh's counter complaint requested that the district court grant Waugh sole legal and physical custody of Layla, grant McManus reasonable visitation, modify child support and other out of pocket expenses pursuant to the Nebraska Child Support Guidelines, and award Waugh attorney fees should McManus' actions warrant such. Waugh later filed an amended answer and cross complaint which did not change the substance of the allegations.

McManus filed an answer and cross complaint alleging material changes in circumstances, including that Waugh had failed to communicate with McManus regarding Layla; Waugh's girlfriend was the individual co-parenting with McManus; Waugh's girlfriend was the individual doing the majority of the parenting during Waugh's time with Layla; Waugh had failed to adequately provide for Layla's education, safety, welfare, and overall wellbeing; Waugh had failed to abide by the parenting plan; McManus' mother, Angela, was clean and sober and should now be allowed around Layla; and there had been a change in the parties' financial circumstances. McManus' cross complaint requested that the district court grant McManus sole legal and physical custody of Layla, grant Waugh reasonable visitation, modify child support and other out of pocket expenses pursuant to the Nebraska Child Support Guidelines, modify the decree to remove any provisions that prohibit Angela from being around Layla, and award McManus attorney fees.

A 2-day trial on the parties' modification complaints was held over July and August 2025. The following evidence was adduced.

### (a) Layla's Emotional Needs

Waugh testified that in the fall of 2023, Layla began having behavioral issues at school. These behavioral issues included failing to follow directions, talking during classroom instruction, being disrespectful to teachers, punching another student, and spitting in another student's face. Waugh noted that Layla's behavior issues were typically worse at the end of the week, during

McManus' parenting time. As a result of these behavioral concerns, Waugh communicated with McManus about Layla seeing a counselor. Text messages entered into evidence demonstrated that both Waugh and McManus agreed that counseling would be beneficial for Layla.

Waugh then placed Layla on a wait list for Jody Angel-Trejo, a licensed mental health clinician. Angel-Trejo began seeing Layla in November 2024. Waugh did not inform McManus that he had selected Angel-Trejo to be Layla's counselor, or that Layla had begun counseling. McManus first became aware that Layla was seeing Angel-Trejo when Angel-Trejo provided an affidavit for a prior hearing in these proceedings. At that point McManus objected to Layla's participation in counseling because she had not been included in selecting the provider. Waugh filed a motion requesting that the district court allow Layla to continue her counseling with Angel-Trejo. The court later sustained the motion.

Angel-Trejo testified that she initially saw Layla weekly, but that her counseling appointments had been reduced to once every 3 weeks. Angel-Trejo diagnosed Layla with adjustment disorder with anxiety, as chronic worry and stress impacts Layla's functioning at home and school. Angel-Trejo was not familiar with the specifics of the parties' parenting time arrangement.

During counseling, Layla has described feeling emotionally safe at Waugh's home and that she likes to be there. Angel-Trejo has observed there to be more routine at Waugh's home, based on Layla's reports. Angel-Trejo also observed there to be more relational and emotional engagement at Waugh's home. Waugh's girlfriend, Dylann, is Layla's most consistent source of communication, connection, and safety. Dylann resides with Waugh and the two share a toddler son.

Layla's feeling of emotional safety varies at McManus' home. Layla has observed that McManus' home has less structure and routine. McManus' relationships or personal patterns also create a sense of inconsistency or uncertainty for Layla. Angel-Trejo has observed Layla to have underlying worry about McManus' wellbeing and a lack of confidence in McManus' ability to make choices that will create emotional safety for Layla.

Layla does not feel comfortable being around Dustin, McManus' former boyfriend. Dustin and McManus share an infant son. McManus testified that while the two were no longer romantically involved, she and Dustin shared a coparenting relationship, and Dustin was frequently at her home to see their son. Layla indicated to Angel-Trejo that she and Dustin do not converse or interact when he is at McManus' home. This was concerning to Angel-Trejo as the dynamic could create discomfort in an already anxious child.

Angel-Trejo testified that Layla was aware that Dustin had been in jail and she was worried about her little brother not having a "good dad." Both Waugh and McManus testified that Dustin has a criminal history and pending charges for possession of methamphetamine and for theft by receiving stolen property. McManus testified that she did not allow Dustin in her home until he demonstrated that he had completed a drug treatment program. A certificate of completion, dated March 2025, was entered into evidence.

The provision in the parenting plan that prevents Angela from being around Layla was created due to concerns regarding Angela's methamphetamine use. Angel-Trejo testified that Layla's knowledge that she is not to be around Angela creates some conflict and stress. Angela testified that she has been sober for 5 years and is actively engaged in a variety of sober

- 3 -

communities. Angela and Layla have had contact through telephone and video calls since 2021. Angela provides childcare for McManus' infant son, and McManus and Angela plan ahead so Angela does not come into physical contact with Layla. For example, when McManus takes Layla to school, they leave out the front door of the home and Angela arrives through the back door. McManus and Angela testified that on one occasion there was a miscommunication that resulted in Angela and Layla briefly crossing paths. Waugh testified that he happened to be driving by as this interaction occurred and reported it to law enforcement. McManus requested that the district court allow Angela to have contact with Layla as Angela had been sober for a number of years and McManus wanted Layla to have relationships with her extended family.

Angel-Trejo testified that both Waugh and McManus have been engaged in Layla's counseling, though Waugh brings Layla to more sessions, was the parent who sought counseling, and has been faster to reach out to Angel-Trejo with any perceived issues. McManus has less initiative to bring issues to Angel-Trejo, but when asked to engage, McManus has been willing to do so. Angel-Trejo has observed some inconsistencies between reports from McManus and Layla.

Layla's progress has been variable during her counseling. In June 2025, Layla's anxiety score was recorded as "minimal." On July 8, Waugh brought Layla in for an "emergency" session with Angel-Trejo because he was concerned about what Layla had reported about McManus' parenting time the weekend prior. At this session, Layla reported to Angel-Trejo that she had cried over the weekend and that she did not want to return to McManus' home because McManus and Dustin had gotten into a fight. Angel-Trejo testified that Layla had said, "Ms. Jody[,] can you help me not to be there." Layla described McManus screaming and running after Dustin as he left her home. Layla also reported leaving the home to go look for McManus, who she found across the street. Layla estimated that there had been five recent conflicts between McManus and Dustin.

McManus did not testify directly regarding her alleged fight with Dustin but believed that Layla had been coached to make the statements. Angel-Trejo testified that the timing of the emergency session felt "uncertain" to her, but she did not have concerns that Layla had been coached. Angel-Trejo has had "very candid conversation" with Waugh regarding his coparenting with McManus and how their dynamic impacts Layla. Angel-Trejo believed that Waugh only wanted Layla to be well and was concerned that she was not.

At this session Layla also reported that there was no food at McManus' home. Dylann called the child abuse and neglect hotline after Layla returned to Waugh's home after a weekend with McManus and ate portions of food that indicated to Dylann that there was not enough food at McManus' home. McManus testified that there was food in her home and offered into evidence photographs of the food presently in her pantry, fridge, and freezer.

Layla struggles with transitioning between the two households. Dylann testified that when Layla returns to Waugh's from McManus', she is very tired or emotional to the point of crying. Dylann began implementing "decompression baths" on the days Layla returns to Waugh's home to manage Layla's anxiety. During these decompression baths, Layla unwinds and relaxes in the bathtub.

McManus was not aware of the decompression baths prior to trial and does not have a similar ritual for when Layla transitions from Waugh's home. At times McManus observes that Layla does not want to leave McManus' to go to Waugh's and McManus will talk with Layla about her feelings. The decompression baths concerned McManus because the baths were signaling to

Layla "that there's something wrong with my house and that she needs these decompression baths to relax . . . [and] that there's something wrong with my house, which is kind of alienating me from her."

### (b) McManus' Alleged Drug Use

Both Waugh and Dylann testified to concerns that McManus was using drugs while Layla was in her care. Both testified to occasionally smelling marijuana on Layla's clothing and backpack after returning from McManus' home. Waugh once called law enforcement after picking Layla up from McManus' and noting the strong smell of marijuana inside McManus' home.

Based on these concerns, Dylann and Waugh took Layla to a testing center to have a hair follicle test performed on her in November 2024. Because the test occurred during the weekday, Dylann called Layla's school to say she would be absent. The hair follicle test occurred without McManus' knowledge or consent. The family support worker who collected the hair follicle sample from Layla testified to the collection process for testing. The worker's supervisor then sent Layla's sample to a testing laboratory, and a report was subsequently generated. The report was sent to the worker's supervisor, who shared it with her.

McManus objected when the report of Layla's hair follicle test results was offered into evidence. The district court sustained the objection based on foundation and hearsay. Dylann later testified that she called the child abuse and neglect hotline to report that Layla's hair follicle test was positive for cannabinoids.

In February 2025, Waugh filed a motion alleging that McManus was using marijuana around Layla and requested that McManus be ordered to submit her own hair follicle test. The district court sustained the motion and McManus submitted to a hair follicle test in March. The worker who collected McManus' sample testified to the collection and submission process and stated that a report was generated by a laboratory following the testing of McManus' sample. McManus objected when the report of her hair follicle results was offered into evidence. The district court sustained the objection based on foundation and hearsay.

McManus testified that her hair follicle test indicated a positive result for marijuana but denied any marijuana use. McManus acknowledged that she uses commercially available CBD products to help with her sleep, anxiety, and depression. She denied using the CBD products during the day while she cared for Layla.

### (c) McManus' Finances

McManus previously had an unreliable vehicle and relied on others, including Waugh, Dylann, and Waugh's mother, to assist in her transportation. Because of this assistance, McManus testified that she always made it to work, and that Layla has been able to attend her appointments and school without issue. Waugh testified that McManus' transportation issues had affected Layla's school attendance. Layla's report card from the 2024-2025 school year reflects minimal absences occurring during both Waugh and McManus's parenting time. McManus had gotten a new vehicle roughly 7 months prior to trial and stated that she has not had transportation issues since that time.

At the time of trial, McManus was working as a server at a restaurant for 20 hours a week. McManus was trying to receive more hours at the restaurant and testified that because Angela was

her childcare provider, she would be able to work full-time if Angela and Layla were permitted to have in person contact. McManus also receives Medicaid and food assistance. Layla is enrolled in Medicaid and thus does not have medical expenses.

Layla was enrolled in a daycare in Kearney during 2021 and 2022. Waugh testified that despite McManus using the daycare and being ordered to pay 50 percent of daycare expenses, she has not reimbursed him for any expenses. Waugh testified that although he was not seeking a reimbursement of the daycare expenses, McManus' inability to share the expenses demonstrated her failure to provide for Layla's basic needs. McManus denied ever using the daycare during the time Layla was enrolled as she had arranged her work schedule to be home with Layla during her parenting time. Waugh did not ask McManus to contribute to the selection process for the daycare, nor did Waugh bill McManus for the daycare expenses.

### (d) Home Environments and Proposed Parenting Plans

At the time of this action, Waugh lived in Kearney and McManus in Gibbon. Layla had her own room in both households. Layla also has a little brother at each household.

Waugh testified that since the entry of the decree, he has lived in two residences. He has lived in his current home for the past 3 years. Waugh believed that McManus had moved six times since the decree. Waugh was concerned that McManus' frequent moves were causing instability for Layla. Waugh was also aware of two eviction actions filed against McManus for failure to pay rent. McManus testified that she has moved three times since the entry of the decree and that she has been in her current home for the past 2 years. McManus' eviction notices had been dismissed, and she had no intention of moving from her current home.

Both Waugh and Dylann testified that Layla is frequently dirty and smelling of body odor when she returns to their home from McManus' home. McManus described teaching Layla basic hygiene and McManus' family members and friends testified that Layla is clean and well-groomed when she is in McManus' care.

McManus testified that she more frequently communicates with Dylann than with Waugh regarding Layla. Waugh disagreed that Dylann communicates with McManus more frequently than he does.

Both Waugh and McManus offered their own proposed parenting plan into evidence. Waugh's parenting plan awarded him sole legal and physical custody and limited McManus' parenting time to Saturdays from 9 a.m. to 6 p.m. In the summer, McManus' parenting time would be extended to include Sunday from 9 a.m. to 6 p.m. Waugh's parenting plan included that McManus' parenting time should be supervised by an approved third party and maintained the prohibition regarding Angela's in-person contact with Layla.

McManus' parenting plan awarded the parties joint legal and physical custody of Layla. In the event that the parties reach an impasse, McManus proposed that she should have the final say. McManus' parenting plan modified the parenting time schedule to a rotating week on/week off schedule, with the parties exchanging Layla each Friday at 6 p.m. McManus testified that Layla would benefit from fewer transitions throughout the week and that it would be easier to ensure that Layla has everything she needs for school, as there had been issues with her forgetting items at the other household.

### 3. Order

On September 4, 2025, the district court entered a modification order. The court found that Waugh did not establish the material changes of circumstances alleged in this cross complaint. The court also found that McManus had established that Waugh's failure to communicate and abide by the parenting plan, and that Angela was now sober and should be allowed around Layla, were material changes in circumstances.

The district court generally adopted McManus' proposed parenting plan but amended the language regarding legal custody to provide that "in the event of an impasse, father shall have the final say." The court was concerned that McManus might not continue with Layla's counseling and further noted testimony that there appeared to be more routine at Waugh's home. The court found that the proposed week on/week off parenting time schedule may reduce the number of transitions between the households. The court also found that Waugh should pay child support under a joint custody calculation in the amount of $73 per month. The court awarded McManus $2,500 in attorney fees.

Waugh appeals.

## III. ASSIGNMENTS OF ERROR

Waugh assigns, reordered and consolidated, that the district court erred by (1) failing to admit the drug test results into evidence, (2) finding that Waugh had failed to establish a material change in circumstances, (3) finding that joint custody was in the child's best interests, (4) awarding support under a joint child support calculation, and (5) awarding McManus attorney fees.

## IV. STANDARD OF REVIEW

Hearsay is not admissible except as provided by the Nebraska Evidence Rules. *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024). Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds. *Id*.

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *Jones v. Colgrove*, 319 Neb. 461, 24 N.W.3d 1 (2025). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

A trial court's decision awarding or denying attorney fees will be upheld on appeal absent an abuse of discretion. *Hawks v. Hawks*, 32 Neb. App. 70, 993 N.W.2d 688 (2023).

## V. ANALYSIS

### 1. Admissibility of Drug Test Results

Waugh first assigns that the district court erred by failing to admit Layla's and McManus' drug test results into evidence. Waugh argues that the test results should have been received under the business records exception to the hearsay rule.

The party seeking to admit a business record under the business records exception to the hearsay rule bears the burden of establishing foundation under a three-part test. *State v. Walker*, 29 Neb. App. 292, 953 N.W.2d 65 (2020). First, the proponent must establish that the activity recorded is of a type that regularly occurs in the course of the business' day-to-day activities. *Id.* Second, the proponent must establish that the record was made as part of a regular business practice at or near the time of the event recorded. *Id.* Third, the proponent must authenticate the record by a custodian or other qualified witness. *Id.* Firsthand knowledge of the actual recording is not a foundational step to qualifying the record as a business record, and any lack of firsthand knowledge on the part of the custodian or other witness who lays foundation for the document goes simply to its weight. *Id.*

We note that the business records exception to hearsay excludes "opinions and diagnoses." See Neb. Rev. Stat. § 27-803(6) (Cum. Supp. 2024). Further, as found by the district court, the individuals who collected the hair follicle samples testified only to their collection process and that a laboratory test was later conducted on the samples. No foundational evidence was provided regarding the reliability of the drug tests, the testing procedure, who conducted the tests, any control or assurance measures taken during testing, or how the test results were recorded or transmitted. As such, Waugh failed to meet the burden of establishing foundation and the district court did not err in refusing to admit the drug test results into evidence.

## 2. MODIFICATION OF CUSTODY

Waugh assigns that the district court abused its discretion in modifying the paternity decree to award joint legal and physical custody in a week on/week off schedule. He argues that the court erred in finding that he had not established the material changes in circumstances alleged in his cross complaint. He also argues that a joint custody award is not in Layla's best interests and that the court erred by reducing his own parenting time and not requiring that McManus' parenting time be supervised.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action. *Scott v. Dorrance*, 32 Neb. App. 213, 995 N.W.2d 226 (2023). Modifying a custody or parenting time order requires two steps of proof. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id.* Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.*

### (a) Material Change in Circumstances

Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. *Id.* Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances. *Id.*

The district court found that McManus had established material changes in circumstances, specifically that Waugh had failed to communicate with McManus regarding Layla; Waugh had failed to abide by the parenting plan; and that Angela is now sober and should be allowed around Layla. The court found that Waugh took Layla from school "under misrepresented pretenses for a hair follicle collection. That action is contrary to the Parenting Plan and is a failure to communicate with the mother." Further, the court found that the provision regarding Angela appeared unnecessary and may be an additional source of stress and conflict for Layla. We find no abuse of discretion in the court's determination that a material change in circumstances had occurred.

Waugh concedes that the district court properly found that a material change in circumstances existed and that "it is not determinative which party establishes a material change in circumstances." Brief for appellant at 13. Though the district court found that Waugh had not proven his alleged material changes in circumstances, the court considered Waugh's allegations and evidence in its determination that a modification of the decree was in Layla's best interests. We likewise consider Waugh's evidence regarding a material change in circumstances in our best interests analysis below.

(b) Best Interests

"Legal custody means the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(13) (Cum. Supp. 2024). "Physical custody" is defined by the Parenting Act as "authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time." § 43-2922(20).

With respect to best interests, Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and

stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

In finding that modification of the parenting plan was in Layla's best interests, the district court made specific findings as to McManus and Layla's relationship with Dustin. The district court found that Layla appeared to have a negative perception of Dustin and that McManus' relationship with Dustin had caused a degree of instability for McManus. However, the court did not find that McManus' relationship with Dustin was permanent or continuous. The court emphasized McManus' testimony that she is no longer in a romantic relationship with Dustin and that her current relationship with him is as a coparent to their infant son. The court found Layla's statements to Angel-Trejo during her session on July 8, 2025, regarding her witnessing a conflict between McManus and Dustin, to be insufficient to rebut McManus' testimony.

Regarding McManus' alleged drug use, Waugh and Dylann testified to smelling marijuana on Layla's clothes or backpack after her return from McManus' home. McManus admitted to using commercially available CBD products. The district court noted that Waugh took Layla for a hair follicle test without the knowledge or consent of McManus. The result of the test was not admitted into evidence and the court found that there was little other admissible evidence of McManus' drug use.

The district court found that Angela currently watches McManus' son but must leave when Layla arrives. Angela speaks to Layla on the phone or by video. Angela testified that she is 5 years sober. Angel-Trejo testified that Layla's knowledge that she is not to be around Angela creates some conflict and stress. The court found that the prohibition regarding Angela in the current parenting plan was no longer necessary and may be contrary to Layla's best interests.

The district court found that Layla was diagnosed with adjustment disorder and anxiety. Angel-Trejo testified that McManus' relationships or personal patterns create a sense of uncertainty for Layla. Layla has difficulty transitioning back to Waugh's home, which reportedly has more routine for Layla. The court noted that Angel-Trejo was not familiar with the parenting time arrangement between the parties. Angel-Trejo was also not asked whether she knew of Waugh taking Layla for hair follicle testing or that Layla was given "decompression baths" upon her return to Waugh's home.

The district court noted that Layla's statements made in her last session with Angel-Trejo reflect that Layla was aware there was a court proceeding and that Angel-Trejo may have a role in that proceeding. The court found that nothing in Angel-Trejo's testimony "supports the drastic reduction of the mother's parenting time as suggested in the father's proposed Parenting Plan."

The district court found that McManus appeared to have some financial difficulties. However, the court could not find this condition to be permanent or continuous. The court noted that McManus claimed to have a more reliable vehicle at the time of the trial. The court also found that due to McManus residing in Gibbon, transportation was likely a larger issue than it would be if both parties resided in the same town.

Finally, the district court found that evidence of communication between the parties tended to substantiate McManus' claim that most communication is with Dylann. Such communication appeared cordial and appropriate. The court noted that while communicating through Dylann was not ideal, it was not contrary to Layla's best interests.

- 10 -

Regarding Waugh's argument that the district court erred in reducing his parenting time from 60 percent to 50 percent with the week on/week off schedule, evidence at trial clearly established that Layla struggled with transitioning between her parents' households throughout the week. The district court specifically noted that the week on/week off schedule would reduce the number of transitions for Layla. Additionally, McManus testified that a week on/week off schedule would be beneficial as Layla had forgotten school items at Waugh's when she transitioned midweek.

Waugh argues that the district court erred in failing to require McManus' parenting time be supervised. The district court specifically found that there was little evidence supporting McManus' alleged drug use. Layla's report card established that she was doing well in school academically and had good attendance. Though McManus was initially resistant to Layla continuing with counseling, that resistance was attributed to Waugh unilaterally selecting Angel-Trejo as Layla's counselor. Angel-Trejo testified that McManus was engaged in Layla's treatment and Layla's anxiety levels had generally improved during her counseling sessions. Further, both Dylann and Waugh testified to repeatedly calling the child abuse and neglect hotline and law enforcement with allegations relating to McManus. It does not appear that any of the reports were substantiated or that any institutions found Layla to be at risk of harm in McManus' care.

Much of the evidence in this case was in conflict, and we consider and give weight to the fact that the district court heard and observed the witnesses and accepted McManus' version of the facts rather than Waugh's. See *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021). Upon our de novo review, we find no abuse of discretion in the court's determination that it was in Layla's best interests to modify the parenting plan to a rotating week on/week off schedule and in not requiring McManus' parenting time to be supervised.

### 3. MODIFICATION OF CHILD SUPPORT

Waugh next assigns that the district court erred in imposing a joint child support obligation. Waugh's corresponding argument is only, "For the reasons stated above, joint custody is inappropriate and therefore, a joint custody child support calculation is as well." Brief for appellant at 32.

Waugh does not specifically argue his assigned error concerning his modified child support obligation; therefore, we do not address it. In order to be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief. *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357, 363 (2020). Further, because we have found joint custody to be appropriate, this argument fails.

### 4. AWARD OF ATTORNEY FEES

Lastly, Waugh assigns that the district court abused its discretion in awarding McManus attorney fees. He argues that the attorney fee award was based solely on his greater earnings.

Attorney fees and expenses may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Beatty v. Poitier*, 319 Neb. 56, 21 N.W.3d 295 (2025). Although attorney fees and costs are statutorily allowed in paternity and child support cases, customarily they are awarded

to the prevailing party or assessed against those who file frivolous suits. *Id*. An award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Id*.

McManus testified that she had incurred attorney fees throughout the case and requested that Waugh contribute to the fees. The district court received the attorney fee affidavit offered by McManus, reflecting that as of July 10, 2025, McManus had already incurred $9,002.42 in attorney fees and was estimated to incur another $4,000 related to the final hearing.

The district court found that though both parties had filed various pretrial motions and objections, Waugh unsuccessfully sought an ex parte custody order. The court also found that Waugh's attempt to offer the results of hair follicle testing without obtaining the testimony of the persons performing the test resulted in unnecessary litigation time. "Considering nature of the actions, the result obtained and the relative circumstances of the parties," the court awarded McManus $2,500 of attorney fees. Upon our review of the record, we find no abuse of discretion in the district court's award of attorney fees in this case.

## VI. CONCLUSION

We find no error by the district court in refusing to admit the drug test results into evidence. The district court did not abuse its discretion in modifying the parenting plan and awarding McManus attorney fees.

AFFIRMED.