Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/12/2023 09:08 AM CDT

CRYSTAL LEE SCOTT, APPELLEE, V.
RONALD ELLIS DORRANCE, APPELLANT.

___ N.W.2d ___

Filed August 29, 2023.    No. A-22-786.

1. **Child Custody: Appeal and Error.** Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

2. **Modification of Decree: Child Support: Appeal and Error.** Modification of child support is entrusted to the discretion of the trial court. An appellate court reviews proceedings for modification of child support de novo on the record and will affirm the judgment of the trial court absent an abuse of discretion.

3. **Child Custody.** While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference regarding child custody, the child's preference is entitled to consideration, alongside other factors.

4. ____. The amount of consideration given to a child's stated preference regarding child custody will depend on the child's age and ability to give reasons for his or her preference.

5. **Child Custody: Appeal and Error.** Where a trial court's order modifying child custody demonstrates that the child's age and reasoning have been duly considered alongside the child's stated preference, an appellate court will generally defer to the trial court's credibility determinations in the assessment of facts.

6. **Modification of Decree: Child Custody: Proof.** Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action.

7. ____: ____: ____. The showing required to modify custody is a two-step process: First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous

custody order and affecting the best interests of the child. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests.

8. **Child Custody.** When determining the best interests of the child in the context of custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse.

9. **Child Support: Rules of the Supreme Court.** Under Neb. Ct. R. § 4-215(B) (rev. 2020) of the Nebraska Child Support Guidelines, the child support paid by the obligor parent is intended to cover up to $250 in nonreimbursed health care costs per child per year before the obligor parent must contribute to such expenses.

10. ____: ____. To require an obligor parent to contribute to the initial child support guidelines estimate of $250 per child per year for nonreimbursed medical expenses subsumed within the amount of child support ordered, the trial court must provide an explanation for its deviation from the guidelines.

Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed in part, affirmed in part as modified, and in part reversed and vacated.

Leslie A. Christensen for appellant.

Joni Visek for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

# I. INTRODUCTION

Ronald Ellis Dorrance (Ronald) appeals from the Sarpy County District Court's order denying his request to modify custody of his two children to a joint physical custody arrangement. He also challenges the court's handling of nonreimbursed health care costs and other direct expenditures for the children, including, but not limited to, clothing and

extracurricular activities. We cannot say the court abused its discretion regarding the request for joint physical custody; however, we conclude the court did abuse its discretion regarding nonreimbursed health care costs and other direct expenditures. Therefore, we affirm in part, affirm in part as modified, and in part reverse and vacate.

## II. BACKGROUND

### 1. Iowa Proceedings

Ronald and Crystal Lee Scott (Crystal) were never married. They had two children while living in Iowa: Jackson, born in 2011, and Ryder, born in 2012. In October 2013, the Pottawattamie County District Court in Iowa entered an order granting the parties joint legal custody of the children and awarding Crystal primary physical custody, subject to Ronald's parenting time.

In December 2013, Ronald filed a petition for modification, requesting that the Iowa court reduce his child support obligation. In August 2014, Ronald amended his petition to also seek "joint physical care" of the children. He claimed that Crystal had interfered with his parenting time by moving to Bellevue, Nebraska, which was an hour away from Mondamin, Iowa, where Ronald lived at the time. Ronald subsequently amended his petition further to seek "sole physical care" of the children and, in the alternative, "shared physical care."

On February 17, 2015, the Iowa court entered an order declining to grant Ronald "primary physical care" of the children or to award him "shared physical care" because it found that Ronald and Crystal did not get along well enough to facilitate such an arrangement. However, it found that Crystal's move to Bellevue constituted a material change in circumstances. As such, it modified the custody order to require that Ronald provide transportation at the beginning of his parenting time and that Crystal provide transportation at the end of Ronald's parenting time. It also altered Ronald's parenting time to every other week from Thursday at 6 p.m. to

Sunday at 6 p.m. during the school year, and every other week during the summer months. Ronald's child support obligation was reduced to $914 per month. Under the modified order, Ronald and Crystal were responsible for paying 68 percent and 32 percent of the children's "uncovered medical expenses," respectively.

## 2. CURRENT PROCEEDINGS

### (a) Complaint to Modify

On June 10, 2021, Ronald filed a "Complaint to Modify" in Nebraska after registering the Iowa order. Ronald alleged that "there h[ad] been substantial and material changes in circumstances," including that Ronald moved from Mondamin to Bellevue, that the children had "reached an age and maturity level" such that "additional parenting time between the minor children and [Ronald] [wa]s in the minor children's best interests," and that the children desired additional parenting time with Ronald. He asked that the district court award the parties joint physical custody of the children and that his "child support obligation . . . be reviewed and determined in accordance with the Nebraska Child Support Guidelines pursuant to his request for joint physical custody." Crystal filed an answer denying the material allegations in Ronald's complaint.

### (b) Trial

Trial was held on June 23, 2022. The parties offered exhibits and witness testimony, and the court interviewed Jackson and Ryder in camera. We now set forth the evidence relevant to the issues on appeal.

#### (i) Move to Nebraska

Ronald and Crystal testified about their moves from Iowa to Nebraska. Crystal and the children lived in Missouri Valley, Iowa, and Ronald lived in Mondamin. According to Crystal, the two towns are 15 minutes apart. Crystal testified that she and the children moved to Bellevue in 2015 to be closer to friends and family after her father passed away and she no

longer had family nearby in Iowa. Bellevue is an hour away from Mondamin, where Ronald remained until he moved to Bellevue in 2021.

Ronald testified that in 2013, when the Iowa court entered the initial custody order, he worked for an electrical union, which meant that he had little flexibility with his work hours. With his job in Iowa, Ronald struggled to take the children to school on time. However, when he moved to Bellevue, he obtained new employment that did not pose a scheduling conflict with the children's school dropoff time.

### (ii) Coparenting Difficulties

Ronald testified that he supported the children's relationship with Crystal. As an example of his support, Ronald stated that he encouraged the children to speak with their mother whenever they were "in the same area" for a "baseball game or school activity." However, when Crystal was asked whether there had "been a change in the ability of [Ronald and her] to coparent," Crystal responded that "[t]here ha[d] not been any change." She stated that she and Ronald were "not able to coparent," they could "never come to an agreement," and "[t]here [was] the slightest issue on every discussion that [they] ha[d] together." Crystal further stated that although the district court required the parties to participate in mediation, "[n]othing was resolved" during mediation.

A major point of contention between the parties was the children's participation in sports. Ronald stated that he and Crystal had a "mutual agreement" that Crystal would make decisions regarding the children's participation in fall sports and he would make decisions regarding the children's participation in spring sports. Crystal characterized the "agreement" differently. She stated that Ronald "just paid for baseball, and [she] paid for football"; however, they "never really verbally agreed" to the arrangement. She stated that she would prefer that they "come to an agreement together" regarding the children's participation in sports and that in the case of an impasse, she would have final say.

Ronald disagreed with Crystal's decision to have the children "play[] football at Bellevue," but because football is a fall sport, he considered Crystal's decision final and "let it go." Ronald unilaterally switched the children from a select baseball team to a recreational team that he coached. He stated that he did so because the children were complaining "about coaching, attitudes, [and] the stress they felt" with the select team. He further stated that he observed the coach for the select team "screaming, yelling, [and] cussing at the kids." He said the children cried at the select team's practices and "they were scared."

Crystal claimed that Ronald did not discuss the decision to change the children's baseball team with her and that the children "were very upset and cried" when he moved them to the recreational team. When asked about her opinion regarding Ronald's decision, she stated that she felt it was "a back down of [the children's] skills." Crystal wanted the children to return to the select team because the children's "friends that they['d] grown up with since kindergarten [were] on the team, and they enjoy[ed] the team, and [they had] all bec[o]me a family."

Ronald admitted that he did not discuss the decision to change the children's baseball team with Crystal. When asked whether he believed he should discuss such a decision with Crystal outside the presence of the children, he stated that he "wish[ed] it could be. But it never is."

### (iii) Children's In Camera Interviews

The district court separately interviewed Jackson and Ryder in camera at the onset of trial. Although both boys were 10 years old at the time of trial, Jackson was 11 months older and was entering sixth grade, while Ryder was entering fifth grade. The parties' attorneys were present. Following the interviews, the court informed Ronald and Crystal that it was putting a "protective order over [the children's] testimony" that would remain in effect until the court issued its decision, meaning

they were "prohibited from asking what [the children] testified to in chambers" until the court's order was issued.

The children described their living arrangements with Ronald and Crystal. They stated that they had their own bedrooms at Ronald's house. Their chores at Ronald's house included picking up their clothing, washing dishes, and doing laundry. They also had chores when they were with Crystal, including doing dishes, cleaning their rooms, and sweeping. Jackson stated that he does not always complete his chores and that as a consequence, he would "either get yelled at or get [his] electronics taken away" by Ronald or Crystal.

Jackson stated that Ronald informed him he would be "talk[ing] to a judge in a little room." When asked whether Ronald told him "anything that might be important to tell the judge," Jackson responded, "The truth." Jackson stated that he knew Ronald and Crystal were "fighting between how many days they should get" with the children. He stated that Crystal had not told him her desired outcome, but Ronald told him "he wants seven/seven." Ryder informed the court that his parents told him he would be speaking with a judge. When asked whether his parents instructed him what to say to the court, he responded, "No." Later at trial, Ronald testified that he spoke to the children about the hearing, but that he "kept it very vague and simple." He also denied telling them what to say to the court.

The court asked Jackson about whether he liked the summer parenting schedule being on an alternating weekly basis between Ronald and Crystal. Jackson responded that he liked it because "it's fair." Jackson informed the court that his parents fought during the school year about their parenting time. He stated that he "[did]n't think [Ronald and Crystal] would be fighting a lot anymore if it was seven/seven for [his] whole life." When the court asked Jackson what he would "like to see happen going forward," Jackson responded, "[N]ot them fighting." When the court asked Ryder whether there was "anything that [he] would like to see different

than the way it is right now," Ryder responded, "My mom and dad's fighting."

(c) District Court's Order

On September 27, 2022, the district court entered an order declining to grant Ronald joint physical custody of the children with Crystal. Although the court found that Ronald demonstrated a material change in circumstances related to his move from Mondamin to Bellevue, it found that he failed to prove that modifying the child custody arrangement was in the best interests of the children. The court reasoned that, although Ronald and Crystal's relationship had improved over time, it was "not to the point that they [could] effectively coparent." The court pointed out that the parties still had "animosity" between them and that they engaged in "bickering and name calling." It noted that "[c]onflict, such as disagreements over the minor children's sporting teams, result[ed] in sadness and disappointment with the minor children." The court concluded that changing the existing custody arrangement would cause further animosity between Ronald and Crystal and that the "conflict would increase with the shuffling of schedules." It further found that "the parties [we]re unable to meet the greater cooperation needed for joint custody" and that the existing custody arrangement provided the children with necessary certainty and stability. It therefore did not award the parties joint physical custody or otherwise modify Ronald's parenting time.

The district court did, however, modify Ronald's child support obligation, reducing his obligation to $705 per month for two children and $428 per month for one child. It also required that Ronald continue providing the children health insurance and that nonreimbursed health care costs be divided 45 percent to Crystal and 55 percent to Ronald. The court further ordered that "pursuant to §4-212 of the Nebraska Child Support Guidelines, all reasonable and necessary direct expenditures made solely for the children including but not

limited to clothing and extracurricular activities shall be allocated such that [Crystal] shall pay forty-five percent (45%) and [Ronald] shall pay fifty-five percent (55%).”

Ronald appeals.

## III. ASSIGNMENTS OF ERROR

Ronald assigns that the district court erred in (1) failing to consider the minor children's wishes, (2) failing to award Ronald and Crystal joint physical custody or to increase Ronald's parenting time, (3) failing to require Crystal to pay the first $250 in nonreimbursed health care costs per child each year, and (4) allocating reasonable and necessary direct expenditures pursuant to Neb. Ct. R. § 4-212 (rev. 2011) of the Nebraska Child Support Guidelines.

## IV. STANDARD OF REVIEW

[1] Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

[2] Modification of child support is entrusted to the discretion of the trial court. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). An appellate court reviews proceedings for modification of child support de novo on the record and will affirm the judgment of the trial court absent an abuse of discretion. *Id*.

## V. ANALYSIS

### 1. Joint Physical Custody

In Ronald's first two assigned errors, he contends the district court abused its discretion in failing to consider the children's wishes and, ultimately, in failing to award joint physical custody of the children to the parties or, alternatively, additional parenting time to him. We first address the children's testimony.

(a) Children's Wishes

[3-5] While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration, alongside other factors. See *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020). The amount of consideration will depend on the child's age and ability to give reasons for his or her preference. *Id.* For example, in cases where a child's stated preference is given significant consideration, the child was typically over 10 years old. See *id.* More consideration will be afforded where additional factors that bear on the child's best interests undergird the child's stated preference and reasoning. *Id.* Where a trial court's order demonstrates that the child's age and reasoning have been duly considered alongside the child's stated preference, we will generally defer to the trial court's credibility determinations in our assessment of facts. *Id.*

At the time of trial in June 2022, Jackson was about to turn 11 years old and Ryder had just turned 10. There was nothing compelling in either child's testimony related to apportionment of time between their parents and the children's best interests. While Jackson did express that he felt the alternating weeks between his parents in the summer was "fair" and that he did not think his parents "would be fighting a lot anymore if it was seven/seven for [his] whole life," the court concluded that the children "lack[ed] the requisite maturity and sophistication to weigh-in on the[] proceedings." It specifically found that the "children d[id] not want to be involved in these decisions and expressed that they d[id] not want to be the focus of the[] proceedings." The court also expressed concern that "Ronald coached the children" and questioned if "this coaching . . . influenced the minor children's ability to testify to certain facts or events."

In our review of the children's testimony, we observe that the children did not express their wishes beyond what they considered "fair" for their parents and what they believed

would stop their parents from fighting. Jackson focused on his desire to preserve peace between Ronald and Crystal. He stated that Ronald told him that he wanted a "seven/seven" custody arrangement. When the court asked Jackson what he would "like to see happen going forward," Jackson responded, "[N]ot them fighting." When the district court asked Ryder whether there is "anything that [he] would like to see different than the way it is right now," Ryder only indicated that he did not want Ronald and Crystal to fight. There is nothing in the record to indicate the court failed to consider the children's wishes; rather, the court concluded there was no material change in circumstances based upon their testimony that warranted changing the parenting time arrangement. We cannot say the court abused its discretion in reaching that decision.

### (b) Joint Physical Custody

[6,7] Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). The Nebraska Supreme Court has described this showing as a two-step process: First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. See *id.* Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id.*

[8] When determining the best interests of the child in the context of custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Id.* Other

relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child. *Id.* No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made. *Id.*

Ronald contends the district court erred in failing to grant joint physical custody of the children or award him additional parenting time. He argues that the factors relevant to the best interests of the children weigh in favor of modifying the custody arrangement. He points out that he plays an active role in the children's education and extracurricular activities, he has a flexible work schedule and the ability to timely transport the children to and from school, and Ronald and Crystal do not have disagreements about the children's education, religion, or medical care.

However, the record shows that the parties struggled to make decisions regarding the children. Crystal broadly testified that "[t]here ha[d] not been any change" in the parties' ability to coparent. She stated that they could "never come to an agreement" and "[t]here [wa]s the slightest issue on every discussion that [they] ha[d] together." According to Crystal, "[n]othing was resolved" during the parties' court-ordered mediation. Additionally, a significant portion of trial was dedicated to the children's involvement in sports and the parties' inability to adequately communicate regarding their disagreement on such issues. Ronald himself stated that he wished they could discuss decisions regarding the children's involvement in sports, but they simply could not.

The district court appropriately emphasized the factors of stability in the children's routines and minimalization of contact and conflict between the parents. The court noted that, although "the communication between Crystal and Ronald ha[d] improved over the years, it [was] not to the point that

they [could] effectively coparent." It stated that Ronald and
Crystal often disagreed, which "result[ed] in sadness and dis-
appointment with the minor children." It further stated that
modifying the existing custody arrangement would "cause
further animosity between Crystal and Ronald" and "conflict
would increase with the shuffling of schedules." It concluded
that Ronald and Crystal could not "meet the greater coopera-
tion needed for joint custody" and that the existing arrange-
ment provided the children with the "certainty and stability"
they needed.

While we agree with Ronald that there is some evidence in
the record to support potentially increasing his parenting time,
there is also evidence that weighs against it, as described
above. We therefore cannot find that the district court abused
its discretion in finding that Ronald failed to meet his burden
of showing that joint physical custody was in the best inter-
ests of the children and in declining to change the existing
custody or parenting time arrangement.

## 2. Nonreimbursed Health
## Care Costs

Ronald argues that the district court erred when it failed
to order that Crystal be responsible for the first $250 of the
children's nonreimbursed health care costs each year prior to
allocating such costs between the parties. Ronald correctly
points out that the Nebraska Child Support Guidelines provide
in relevant part:

> Children's health care expenses are specifically included
> in the guidelines amount of up to $250 per child per year.
> . . . All nonreimbursed reasonable and necessary chil-
> dren's health care costs in excess of $250 per child per
> year shall be allocated to the obligor parent as determined
> by the court, but shall not exceed the proportion of the
> obligor's parental contribution . . . .

Neb. Ct. R. § 4-215(B) (rev. 2020).

[9,10] The district court ordered that Crystal be respon-
sible for 45 percent of nonreimbursed health care costs and

that Ronald be responsible for 55 percent of such costs, which was an appropriate apportionment of such costs given their parental contribution percentages under the child support guidelines. However, the court did not limit Ronald's contribution to only those costs in excess of $250 per child per year. As set forth in § 4-215(B), health care expenses are specifically included in the guidelines amount for up to $250 per child per year; in other words, the child support paid by the obligor parent is intended to cover up to $250 in nonreimbursed health care costs per child per year before the obligor parent must further contribute to such expenses. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 960, 932 N.W.2d 692, 712 (2019) (guidelines estimate for nonreimbursed medical expenses, which at time was $480 per child per year, is "'subsumed within the amount of child support that is ordered'" and "'[a]ny nonreimbursed expenses exceeding $480 are [then] prorated between the parties'"). While the Nebraska Supreme Court has indicated that the "guidelines do not require the trial court to expressly identify any party as being responsible for the first $480 of nonreimbursed health care expenses [now $250], . . . they do require a court to allocate nonreimbursed health care expenses in excess of $480 per year 'to the obligor parent as determined by the court,'" which "'shall not exceed the proportion of the obligor's parental contribution.'" *Id.* at 960-61, 932 N.W.2d at 712. To require an obligor parent to contribute to the initial child support guidelines estimate of $250 per child per year (previously $480 per year) for nonreimbursed medical expenses subsumed within the amount of child support ordered, the trial court must provide an explanation for its deviation from the guidelines. See *id.* at 961, 932 N.W.2d at 712 (while "trial court may have had a sound reason for wanting [obligor parent] to pay such costs . . . no explanation was provided in the decree, so we have no basis upon which to review a deviation from the guidelines"). See, also, Neb. Ct. R. § 4-203 (rev. 2020), which states that the child support guidelines "shall

be applied as a rebuttable presumption" and "[a]ll orders for child support obligations shall be established in accordance with the provisions of the guidelines unless the court finds that one or both parties have produced sufficient evidence to rebut the presumption"; if the court deviates from a provision in the guidelines, it must provide a "reason for the deviation . . . in the findings portion of the decree or order."

Since the district court did not provide any explanation for deviating from the child support guidelines, it was an abuse of discretion for the court to fail to set off the first $250 in nonreimbursed health care costs per child per year before triggering Ronald's obligation to contribute to such costs. We therefore modify the district court's September 27, 2022, order to conform with § 4-215 by triggering Ronald's obligation for such costs only after the first $250 in such costs have been paid per child per year. Proof of payment of those costs shall be provided to Ronald by Crystal before Ronald's obligation for 55 percent of such costs per child per year shall be triggered.

### 3. REASONABLE AND NECESSARY
### DIRECT EXPENDITURES

The district court ordered that "pursuant to §4-212 of the Nebraska Child Support Guidelines, all reasonable and necessary direct expenditures made solely for the children including but not limited to clothing and extracurricular activities shall be allocated such that [Crystal] shall pay forty-five percent (45%) and [Ronald] shall pay fifty-five percent (55%)." Ronald agrees that if he had been awarded joint physical custody of the children, this provision in the court's order would have been "correct." Brief for appellant at 25. However, since he was not awarded joint physical custody, he contends the court erred in ordering him to pay such costs. We agree that the trial court abused its discretion by ordering such costs under a provision of the child support guidelines applicable to joint physical custody orders.

Section 4-212 of the child support guidelines is titled "Joint physical custody" and provides in relevant part:

When a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is a rebuttable presumption that support shall be calculated using worksheet 3. . . . If child support is determined under this paragraph, all reasonable and necessary direct expenditures made solely for the child(ren) such as clothing and extracurricular activities shall be allocated between the parents, but shall not exceed the proportion of the obligor's parental contributions (worksheet 1, line 6). For purposes of these guidelines, a "day" shall be generally defined as including an overnight period.

Since the district court declined to grant the parties joint physical custody, § 4-212 was not applicable. Further, Ronald's child support obligation was not calculated using worksheet 3 (calculation for joint physical custody). Accordingly, we find that the court abused its discretion in ordering Ronald to pay 55 percent of all reasonable and necessary direct expenditures in addition to his child support obligation. We reverse and vacate that portion of the court's order.

### 4. Attorney Fees

In the conclusion section of her brief, Crystal requests an award of "a reasonable attorney fee of $7,500 for the repeated cost of litigating modifications that are not warranted." Brief for appellee at 14. To the extent her request is an attempt to designate as error the district court's failure to award her attorney fees at trial, we decline to address the issue because Crystal failed to properly present it as an assigned error on cross-appeal. See *In re Estate of Graham*, 301 Neb. 594, 919 N.W.2d 714 (2018) (when brief of appellee fails to present proper cross-appeal pursuant to Neb. Ct. R. App. P. § 2-109 (rev. 2022), appellate court may decline to consider its merits). To the extent Crystal requests attorney fees on appeal,

her request does not comply with the appellate court rules for seeking such an award.

## VI. CONCLUSION

In summary, we affirm the portion of the district court's September 27, 2022, order allocating nonreimbursed health care costs between the parties, but modify it to trigger Ronald's obligation for 55 percent of those costs only after proof of payment of the first $250 per child per year of such costs. We reverse and vacate the portion of the order requiring Ronald to pay reasonable and necessary direct expenditures under § 4-212 of the child support guidelines, since joint physical custody was not awarded. We affirm the remainder of the court's order.

Affirmed in part, affirmed in part as modified, and in part reversed and vacated.