IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF JADEN C. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF JADEN C. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

LEEANNA C., APPELLANT.


Filed October 28, 2025.    No. A-24-868.


Appeal from the Separate Juvenile Court of Sarpy County: SARAH M. MOORE, Judge. Affirmed.

Katrine M. Herrboldt for appellant.

Brianna McLarty, Deputy Sarpy County Attorney, for appellee.


PIRTLE, BISHOP, and FREEMAN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Leeanna C. appeals from the decision of the separate juvenile court of Sarpy County, terminating her parental rights to her three children, Jaden C., Jackson C., and Shayla C. We affirm.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Leeanna is the mother of Jaden, born in 2007; Jackson, born in 2014; and Shayla, born in 2017. Roddy C. is the children's father. The record indicates that Leeanna and Roddy divorced in 2018. The State sought to terminate Roddy's parental rights to the children during these same juvenile proceedings below, and there is some indication that Roddy planned to relinquish his

- 1 -

parental rights. However, neither a relinquishment nor termination of his parental rights appears in our record. Because Roddy is not part of this appeal, he will only be discussed as necessary.

In November 2022, Jaden was living with Leeanna. Jackson and Shayla were living with Sarah B. under an informal agreement between Leeanna and Sarah. Sarah had been a foster parent for Jaden and Jackson in a previous juvenile court case.

Jaden was removed from Leeanna's home on November 8, 2022, due to concerns of "physical and verbal abuse within the home which has resulted/caused the mental health deterioration" of the child. The juvenile court entered an ex parte order granting temporary custody of Jaden to the Nebraska Department of Health and Human Services (DHHS) for out-of-home placement. He has since remained in various placements outside of Leeanna's home. Pursuant to an order on November 15, DHHS was to offer the following services on a voluntary basis to Leeanna: supervised parenting time, an initial diagnostic interview, family support, a chemical dependency evaluation, and random drug screens.

In an ex parte order entered on December 30, 2022, the juvenile court granted temporary custody of Jackson and Shayla to DHHS for out-of-home placement due to concerns that Leeanna "failed to provide said children with care, support, supervision, or housing, nor ha[d] she been actively engaged in their lives." Jackson and Shayla have since remained in placements outside of Leeanna's home. Pursuant to an order entered on January 5, 2023, DHHS was to offer Leeanna supervised parenting time, an initial diagnostic interview, family support, and domestic violence programming.

On April 5, 2023, the State filed a third amended petition, which was further amended by interlineation on April 6. The State alleged that Jaden, Jackson, and Shayla were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they lacked proper parental care by reason of the fault or habits of Leeanna in that: Leeanna's use of alcohol and/or controlled substances placed the children at risk for harm; Jaden had been exposed to inappropriate verbal altercations in Leeanna's home; Jaden reported suicidal ideations, resulting in hospitalization; Leeanna failed to provide proper care, supervision, support, and/or safety for the children; and due to the foregoing allegations, the children were at risk for harm. On April 6, Jaden, Jackson, and Shayla were adjudicated to be within the meaning of § 43-247(3)(a), based on Leeanna's admissions to the allegations in the third amended petition.

Following a disposition hearing on May 11, 2023, and subsequent review and permanency planning hearings, the juvenile court ordered Leeanna to participate in supervised visitation with Jaden and Shayla and therapeutic visitation with Jackson, attend a domestic violence program, participate in an initial diagnostic interview and a parenting assessment, attend individual therapy, participate with family support services, abstain from the use of alcohol and/or controlled substances and submit to random and frequent urine drug tests, and obtain and maintain a legal source of income.

On April 25, 2024, the State filed a motion to terminate Leeanna's parental rights to Jaden, Jackson, and Shayla pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that: Leeanna had substantially and continuously or repeatedly neglected and refused to give the children, or their sibling, necessary parental care and protection; reasonable efforts to preserve and reunify the family, if required, failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a); the children had been in an out-of-home

placement for 15 or more months of the most recent 22 months; and termination of Leeanna's parental rights was in the children's best interests.

## 2. TERMINATION HEARING

A hearing on the motion to terminate Leeanna's parental rights took place over 3 days in September 2024. Several witnesses testified for the State, and exhibits were received into evidence. Leeanna elected not to testify nor offer any additional evidence.

### (a) Events Prior to Children's Removal in 2022

Sarah testified that she was one of the foster placements for Jaden and Jackson in a previous juvenile court case, and that both boys were placed with her in June 2015. She said that "Jaden had had some pretty concerning behavior issues that were kind of violent outbursts and a lot of that was directed towards Jackson." Jaden also had some sexualized behaviors. For safety reasons, Jaden had to leave Sarah's home in August 2016 and go to an inpatient psychiatric facility and then eventually to another foster home. According to Sarah, that juvenile case was resolved when the children were reunified with Leeanna in 2017.

After that previous juvenile case was resolved, Sarah remained a support person for the family through an informal agreement. She explained that from 2017 to 2019, upon the request of Leeanna and Roddy, she would take Jackson and Shayla into her home for "a couple of days," weeks, or months, "depend[ing] on what was needed at the time." Jackson and Shayla's longest stay with Sarah during that 2-year period was "somewhere around eight months when . . . Jaden was waiting to get into Boys Town." Sarah stated that from the time Jackson started kindergarten in 2019, up until December 2022, she was Jackson and Shayla's primary caregiver; "they were primarily living with me," "with the exception of occasional visits" at the request of Leeanna. Sarah made the children's medical appointments and enrolled them in school. Leeanna did not provide Sarah any financial support to care for the children. According to DHHS court reports received into evidence, "[i]t was reported [Leeanna] had only 2 overnight stays with Jackson and Shayla the entire year of 2022."

Sydney Smith, a child and family services specialist, was assigned as this family's caseworker in April 2023. Smith testified that when she received this case, she reviewed the case documentation and court orders. There was a previous juvenile court case, but it was "closed out" when the children were reunified with Leeanna.

According to DHHS court reports and case plans received into evidence in the current case, this family has a "significant history of intakes and CPS involvement." Of note is that in October 2018, there was an intake of alleged physical and emotional abuse of Jaden by Roddy. Jaden reported that Roddy had threatened to stab him and pretended to stab him in the stomach with a knife; Roddy was arrested and cited for child abuse.

### (b) Jaden

Smith testified that in the current juvenile court case, Jaden reported that Leeanna's boyfriend, Steve W., was verbally abusive towards her, and that Leeanna and Steve were both verbally abusive towards him when they were under the influence of alcohol. Jaden was removed from Leeanna's home in November 2022.

The record indicates that Jaden struggles with his mental health and has behavior issues. He has had suicidal ideations since he was 10 years old.

When Smith took over the case in April 2023, Jaden was in a shelter but was "kicked out of the shelter" for "being derogatory, physically aggressive." He then went to a foster home until July 2023, but "they gave notice due to his behaviors, aggression, . . . [and] sexualized behaviors as well." He went to a temporary home for a week or two and then went to his current foster home in August.

Betty Gitari supervised some of Leeanna's visits with Jaden beginning in March 2023. However, Jaden had behavior issues that eventually led to his discharge from the visitation company (it is unclear from our record as to when that discharge occurred). Gitari specifically observed Jaden refuse to go to visits or throw tantrums during the visit. Gitari said that Leeanna "really tried calming him down, but he was definitely difficult even for us workers, because most times we'd have to end the visit early because he wouldn't just calm down and he would give us all a problem for it." When asked for the rationale behind ending the visit early, Gitari responded, "[l]ack of interaction from him" "[a]nd just not wanting to listen to any of us."

Smith testified that in approximately December 2023 or January 2024, DHHS attempted to set up family visitation that included Leeanna and all three children, but "we had to stop it"; "[t]hey had maybe two appointments because Jaden was refusing to go and there was an escalation of everybody's behaviors."

According to a letter authored by Amy Simons, a licensed independent mental health practitioner, family therapy between Leeanna and Jaden was supposed to begin on August 1, 2024, but Leeanna cancelled the first scheduled session and "did not show" for the second appointment; the only family therapy session occurred on August 15. Simons testified that she had not reached the point of creating a treatment plan because she recommended ending family therapy after she was informed by the caseworker that Jaden had been hospitalized and that "part of the hospital's theory for him being there and feeling suicidal was because of his struggles with his visits at the family therapy with his mom." Simons determined that continuing family therapy would be harmful to Jaden.

After family therapy with Jaden ceased, Simons provided individual therapeutic services to Jaden. Simons diagnosed Jaden with "PTSD." His treatment plan included "going through his past trauma, working through it, and helping him figure out how to not have the reactions that he does"; "from what I hear from the caseworker, he was punching a wall, . . . refusing to go to school, things like that."

According to DHHS court reports, Jaden has been in his current foster home since August 2023. At the time of the June 2024 court report, Jaden had a "stable placement," but his foster placement was unwilling to provide permanency. At the time of the termination hearing, Jaden was just days away from turning 17 years old. Smith was asked if Jaden's current placement was a viable option for a guardianship. She responded, "His placement has said that he is still on the fence but more so not going towards guardianship."

(c) Jackson and Shayla

Jackson and Shayla were placed in the custody of DHHS in December 2022, and Sarah became their official foster placement. Sarah was Jackson's foster mother until May 1, 2024, and

- 4 -

she was still Shayla's foster mother at the time of the termination hearing in September. Sarah testified that she had been caring for Shayla since she was 6 weeks old; Shayla had just turned 7 years old at the time of the termination hearing. Sarah described Shayla as a happy child who is creative and loves to play and dance. Her behaviors are "very age appropriate and redirect-able."

However, the testimony from Sarah and others regarding Jackson revealed many concerns. Jackson was 7 months old when he came to Sarah in 2015, and she provided care for him "a lot of his life" up until May 2024. (He was almost 10 years old at the time of the termination hearing in September.) Sarah said that between 2019 and December 2022, Jackson's behaviors in the home were "very normal," "other than being hyperactive," and "[h]e was a pretty well[-]adjusted child all things considered." His pediatrician diagnosed him with "ADHD," and "with Leeanna's blessing," Jackson began therapy in 2021 to address his ADHD and anxiety.

Dr. Megan Carter, a licensed clinical psychologist, began working with Jackson in November 2021. She testified that Jackson had been diagnosed with ADHD and was exhibiting mild disruptive and aggressive behaviors; for example, "he would maybe kick a wall when angry or throw something when upset." Dr. Carter's treatment plan targeted behavioral and emotional regulation skills to help Jackson improve his impulse control. Sarah reported to Dr. Carter that his behaviors improved and occurred less frequently.

Sarah testified that when the current case started in December 2022, "the kids were interviewed by somebody at DHHS fairly quickly," "[a]nd once that happened and Jackson was aware that there [was] something going on, he started exhibiting . . . increased anxiety" and was concerned about what would happen. After visitation was established, Jackson had some "big behaviors" and "pretty intense tantrums," "[m]ostly after the visits." She described the "big behaviors" as "screaming, yelling, throwing things," saying "swear words or racial slurs," and being "really non-compliant." Jackson would also yell and say "inappropriate and harsh things" to Shayla.

Dr. Carter testified that in January or February 2023, she was concerned that "Jackson was not showing the ability to handle visitation safely." "He began exhibiting what in my professional opinion I would call extreme aggressive behaviors to himself, to others, he was eloping, climbed on top of cars, just made very unsafe decisions." On March 27, Dr. Carter drafted a letter expressing her concerns.

In her March 2023 letter, Dr. Carter noted that "[o]ver the last month or so, Jackson has showed a significant and concerning regression" and "[t]his shift in his behaviors occurred almost immediately after" he started visitation with both Leeanna and Jaden present. "Behaviors at first were mild but have clearly been escalating, which is the problem"; "[w]hile an adjustment period is to be expected, the severity of his behaviors is of great concern." Jackson required transport to the emergency room on two occasions within 1 week; one of the transports was initiated by Dr. Carter during a therapy session due to "uncontrollable aggression and outbursts." He was also "being triggered by memories of the abuse from his older brother and his mother not keeping him safe." Dr. Carter recommended that visits be suspended until Jackson could successfully process and work through his trauma. She further recommended that "[i]f visits absolutely have to happen," Jackson and his mother could benefit from family therapy without the other siblings.

In April 2023, the juvenile court entered an order suspending Leeanna's visitation with Jackson, and DHHS was to arrange for family therapy for Leeanna and Jackson "with a trauma

informed therapist." According to DHHS court reports, the three children were assigned separate, individual visits (supervised or therapeutic) with Leeanna beginning in April.

Dr. Carter stated that Jackson and Leeanna began family therapy with Simons, and Simons "took over the trauma focus." Dr. Carter and Simons updated each other on the services they provided to Jackson.

Dr. Carter continued to treat Jackson. By July 2023, he was exhibiting more engagement in sessions, was willing to talk about and practice skills, and he was not showing any disruptiveness or aggression in sessions. It was Dr. Carter's understanding that Jackson had been doing weekly therapeutic sessions with Leeanna, and Dr. Carter agreed that those sessions overlapped with the positive progress she saw in Jackson's treatment from March to July. By October, Jackson was showing minimal episodes of aggression at home as reported by his foster mother. In sessions, Jackson was more willing to take accountability for some of his choices. Jackson was able to have "surface level" conversations about his mother and brother.

In a letter authored by Dr. Carter dated October 4, 2023, she noted "longstanding concerns of possible autism spectrum symptoms, as Jackson has always presented with sensory sensitivities, extreme rigidity and perseveration, and difficulties with identifying and discussing emotions." She stated, "It can be challenging in complex cases such as Jackson's to tease apart what may be possible autism, symptoms related to trauma, and/or reactive attachment disorder." She noted that "[h]e has been on the wait list for quite some time" for an autism evaluation and had finally done an initial intake but actual testing had not yet been completed, due to a pending insurance authorization.

According to Dr. Carter's testimony, by April 2024, it had been reported that Jackson was beginning to display sexualized behaviors. Additionally, he was "back to being extremely noncompliant in session, not engaging, disruptive." Dr. Carter discharged Jackson from treatment on April 24 and referred him to an entity that works with youth who display sexualized behaviors. Dr. Carter also recommended a partial hospitalization program for Jackson.

Simons testified that she provided family therapy to Leeanna and Jackson. Leeanna "would do well" during the sessions, except when "Jackson started to display and dis-regulate and have more behaviors," which occurred at the end of "[m]ost sessions." "He would tear the room apart, throw things" and Leeanna "struggled to get [Jackson] to be able to calm down emotionally and just regulate himself." Jackson "still had behaviors, regardless of how Leeanna attempted to work with him." It was Simons' understanding that Dr. Carter and the foster parent also struggled to manage Jackson's behaviors. Therapeutic sessions ended when Jackson went to Boys Town in the summer of 2024.

Foster mother Sarah testified that Jackson's behaviors improved after his visits were moved to therapeutic visits in 2023 and he "stabilized very well at that point in time." However, in January 2024, there were supposed to be family therapy sessions involving Leeanna and all three children together and Jackson's anxiety increased; "he had a lot of questions about what was going to happen, who he was going to be seeing, what those were going to look like." According to caseworker Smith, DHHS attempted to set up family visitation that included Leeanna and all three children, but "we had to stop it"; "[t]hey had maybe two appointments because Jaden was refusing to go and there was an escalation of everybody's behaviors." Sarah testified that since January, Jackson's behaviors (sexualized behaviors, verbal aggression, and non-compliance) began to

increase in frequency and severity. Due to safety concerns, Jackson had to leave Sarah's home on May 1, and he went to a foster home at a higher level of care, where he was the only child until he could be placed in the residential program at Boys Town that summer.

According to Smith, Jackson had been in the psychiatric residential treatment program at Boys Town since June 2024. The Boys Town staff told Smith the program typically lasted 6 to 9 months, but the longest they had somebody there was 12 months. Smith attended the monthly family team meetings at Boys Town and said that "there's still behaviors that they can't get over yet," "[b]ut overall [Jackson] is improving." Jackson was estimated to be discharged from the program in December 2024, but that was not definite.

(d) Leeanna

According to Simons, she would want to see Leeanna make progress in her individual therapy before restarting family therapy with any of the children. "I want to make sure that she's engaged and able to work with her children on an emotional level." In the beginning, Simons requested Leeanna work on reparation letters to the children. Simons explained that in a reparation letter, the parent acknowledges their role in the situation. The letter "builds trust with the child[] and it also lets the child know that it is not their fault." Simons believed that the reparation letters were necessary to help progress in family therapy. (Leeanna's therapist testified that she and Leeanna had been discussing the reparation letters in individual therapy since March 2024, but Leeanna was not able to complete the task until 2 weeks prior to the termination hearing.) Leeanna had not yet provided those reparation letters to Simons.

Dr. Theodore J. DeLaet, a licensed psychologist, completed a "Forensic Adult Psychological and Parenting Risk Assessment Report" about Leeanna in 2023. According to his report, Leeanna reported that she was married to Roddy until 2018. She claimed Roddy domestically assaulted her "'often'" during their marriage. She disclosed having two child protective services cases, the first in 2009 and the second in 2014, both because her ex-husband physically abused their son(s). Leeanna was currently in a relationship with Steve, but they did not live together. She was currently involved in an abuse and neglect case in juvenile court, and she had also received criminal charges for child abuse and was placed on diversion in January 2023. Leeanna said Jaden told others that he had marks on him that came from her after she had been drinking; she also believed that around the time the juvenile court case started that Jaden and Steve were having conflicts in their relationship. Leeanna wanted to reunify with her children.

In his report, Dr. DeLaet diagnosed Leeanna with an "Unspecified Depressive Disorder"; an "Alcohol Use Disorder, Moderate"; a "Learning Disorder, by History"; and a "Parent-Child Relational Problem." She also had a "rule-out" diagnosis of an "Unspecified Personality Disorder" ("Avoidant, Dependent, and Antisocial Traits"). Under "Parental/Family Risk Factors," he noted that Leeanna

> has significant problematic personality traits and characteristics that are risk [sic] elevating for risk of future maltreatment. Her denial, defensiveness, and blaming are each notable. She has a problem being honest with herself and others. This contributes to a lack of awareness and appreciation of the needs of her children and of others.

In the "Social/Environmental Protective Factors," Dr. DeLaet stated that "[c]oncern is raised due to prior involvement in the juvenile court without apparent demonstration of long-term changes in attitudes, skills or parenting skills after intervention in prior cases." Dr. DeLaet's "Forensic Parenting Risk Determination" was that "[Leeanna] is at MODERATE to MODERATE-HIGH RISK to engage in future child maltreatment." (Emphasis in original.)

In his report, Dr. DeLaet recommended "proceeding with high caution" regarding Leeanna. He also recommended outpatient mental health therapy, and "attention through her therapist of developing and utilizing a functional social support system"; psychiatric medication management for her depression and anxiety symptoms; a behavioral expectation of sobriety; step-wise removal of services to assure support to problem solve any issues encountered; and a "competency-based orientation of [Leeanna] to the needs of her children to include treatment and parenting strategies needed to manage each of her children's needs."

Dr. DeLaet testified that his 2023 report was "a snapshot of where the parent and the children were at that time." He did not know what had happened since the report was released. He agreed that if a parent had accomplished the identified goals set out for them, the risk level would be reduced.

Jessica Martinez is a licensed independent mental health practitioner and a licensed clinical social worker. Martinez testified she began providing individual therapy to Leeanna at the end of November 2023. The treatment goals were to help Leeanna improve her communication, reduce her anxiety and depression, improve her self-esteem and confidence, and address her avoidance and her relationship with her children. Leeanna reported having social anxiety stemming back to her childhood and that impacted her ability to communicate with her caseworker and other professionals and was a barrier for her in seeking employment. Around March 2024, Martinez noticed Leeanna "shift a little bit" and having more direct conversations, but "then from that point it kind of went back to not being able to ask those difficult questions and avoiding the things that we had been talking about." Overall, Martinez did not feel like Leeanna was making progress.

Martinez had concerns about Leeanna's ability to be protective of her children. "[W]hat it boils down to is . . . that anxiety and that fear of being able to speak up and say something"; "I know she wants to protect her kids," "but I don't know that the actions can back it up." Martinez acknowledged that Leeanna had reached out to the current foster parent, Sarah, for help over the years. Martinez stated that she "would still like to work on [Leeanna's] anxiety and her avoidance," and she felt that Leeanna had the potential to get better and change.

Caseworker Smith testified that "[Leeanna] absolutely loves her kids and her kids absolutely love her back" and "they have a very beneficial relationship." When asked if she was concerned about how long Jackson and Shayla had not been in Leeanna's home, including the informal arrangement with the foster mother, Smith responded, "It is a concern."

The evidence established that for most of this case, Leeanna had separate visits with each child. Gitari, a parenting time specialist, supervised Leeanna's visits with Shayla since March 2023. Leeanna had visits with Shayla twice a week; in the beginning visits were for 2 hours but changed to 3 hours sometime before September when visits transitioned to Leeanna's home. Leeanna planned the visits out so that they ran smoothly, and she kept Shayla "very active"; "[m]ost times they'll be outside playing." Gitari observed that Leeanna and Shayla always looked happy to see each other, but sad when it was time to leave. Caseworker Smith was asked what the

barrier was that prevented Shayla from having unsupervised visits with Leeanna; she responded, "I'm not sure what the barrier was to going completely unsupervised." Smith confirmed there were conversations about increasing visits, but there was an issue with the availability of parties or services.

According to Smith, DHHS was concerned that Leeanna's 2-bedroom apartment would not be sufficient to accommodate all three children, and DHHS wanted Leeanna to get a job because, although she had an inheritance, those funds would likely be depleted within a few years.

Smith "believe[d] that [Leeanna] would be able to meet Shayla's specific behaviors, just because they aren't as extreme." But Smith was concerned that Leeanna would not be able to meet Shayla's needs if one or both of her brothers were present. According to Smith, terminating Leeanna's parental rights would be in the best interests of "all three." When asked if the permanency objectives for children are considered individually, Smith responded that "[i]t is to a certain point," but she had not seen a situation where "there has been one reunified, one terminated on"; "I don't know that it's a policy, it's what supervisors have said, that that's what we are supposed to do when we staff," "we don't reunify with one child and not the other ones, it's a package deal, basically."

### 3. JUVENILE COURT'S DECISION

In an order filed on October 25, 2024, the juvenile court terminated Leeanna's parental rights to Jaden, Jackson, and Shayla after finding by clear and convincing evidence that statutory grounds for termination existed pursuant to § 43-292(2), (6), and (7), and that Leeanna was unfit and the termination of her parental rights was in the children's best interests. The court also found and ordered that "continued agency supervised visitation between [Leeanna] and . . . Shayla shall continue as currently scheduled, should the matter be appealed, upon the recommendation of the legal parties; unsupervised and/or increased visitation time or frequency with Shayla is not allowed, at this time." Additionally, "contact between [Leeanna] and Jaden and Jackson[] shall remain at a therapeutic level within family therapy, if/when appropriate, pending any appeal."

Leeanna appeals.

### III. ASSIGNMENTS OF ERROR

Leeanna assigns, reordered and restated, that the juvenile court erred by (1) delegating the decision about the continuation of her therapeutic family visits with the children pending an appeal, (2) receiving exhibits which did not meet the requirements of the business records exception to hearsay, (3) failing to recognize that guardianship was a reasonable permanency alternative to terminating her parental rights, (4) finding that statutory grounds exist to terminate her parental rights under § 43-292(2) and (6), and (5) finding that she was unfit and that termination of her parental rights was in the children's best interests.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate

court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

### 1. THERAPEUTIC VISITS PENDING APPEAL

Leeanna claims that the juvenile court erred when it "delegated the decision" about the continuation of her therapeutic family visits with Jaden and Jackson pending any appeal "to an unspecified entity." Brief for appellant at 39.

The juvenile court has authority, based upon its continuing jurisdiction over the children, to enter orders that are in the best interests of the children, including an order with respect to continued contact with a natural parent whose parental rights are being terminated. *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004). A trial court has a nondelegable duty to determine questions of custody and parenting time of minor children according to their best interests. *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019). The authority to determine custody and visitation cannot be delegated to a third party, because it is a judicial function. *Id.*

In this case, we need not address the merits of Leeanna's argument that the juvenile court improperly delegated decision-making authority regarding her visits "pending any appeal," because that issue is now moot. See *In re Interest of Jaiden L.*, No. A-13-295, 2013 WL 6857594 at *7 (Neb. App. Dec. 31, 2013) (selected for posting to court website) ("[I]nasmuch as the appeal is now over," mother's assertion regarding juvenile court's denial of her motion for visitation during pending appeal "is now moot.")

### 2. EXHIBITS

Leeanna claims that the juvenile court erred by receiving the DHHS court reports and case plans into evidence when they did not meet the requirements of the business records exception to hearsay, Neb. Rev. Stat. § 27-803(6) (Cum. Supp. 2024). The DHHS court reports and case plans are found in exhibits 10, 21, 29, 39, 44, 50, and 62.

The Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007). Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *Id.* In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost. *Id.*

The party seeking to admit a business record under the business records exception to the hearsay rule bears the burden of establishing foundation under a three-part test. See *State v. Walker*, 29 Neb. App. 292, 953 N.W.2d 65 (2020). First, the proponent must establish that the activity recorded is of a type that regularly occurs in the course of the business' day-to-day activities. *Id.* Second, the proponent must establish that the record was made as part of a regular business practice at or near the time of the event recorded. *Id.* Third, the proponent must authenticate the record by a custodian or other qualified witness. *Id.*

The Nebraska Supreme Court previously addressed the receipt of DHHS reports into evidence at termination hearings. It said,

This court has long expressed concern where reports are admitted into evidence at termination hearings and the authors of those reports are not present to lay foundation for the exhibits or to be cross-examined. . . .

In the present case, however, the author of the reports, [the caseworker], laid the foundation for their admission, testified on behalf of the State, and was cross-examined by counsel for [the mother] . . . . Furthermore, [the caseworker] laid appropriate foundation for the admission of the reports pursuant to the hearsay exception for business records . . . . Taken together, these circumstances provide sufficient guarantees of trustworthiness to make consideration of the reports fundamentally fair.

*In re Interest of Kassara M.*, 258 Neb. 90, 95, 601 N.W.2d 917, 923 (1999) (internal citations omitted).

In this case, caseworker Smith testified that DHHS' database is called N-Focus, and it contains the documents related to a specific case, including previous intakes associated with the family. The assigned caseworker makes required contacts with the family members and then must timely record information about those contacts in N-Focus. Additionally, the caseworker uploads information collected from family members and providers into N-Focus, and the information from N-Focus is used to generate the court report and case plan.

Exhibit 62 is the DHHS court report and case plan dated May 4, 2023. Smith confirmed that she was the assigned caseworker at the time of the disposition hearing in May 2023. The following colloquy was had on the record between the State and Smith.

Q [by the State]. Okay. Were you the caseworker that wrote the case plan for that dispositional hearing?

A [Smith]. It [sic] wasn't formally me, then I would have been the one who edited it. I don't remember who's [sic] name was exactly on that one, but it definitely had my edits on it if it's not my name on it.

Q. So, you would recognize that case plan if a copy was shown to you because you would have taken a hand in writing it even though your name wasn't listed on it?

A. Correct.

Q. And you said you don't recall who the caseworker was prior to you?

A. It was Alexis Adams.

Q. . . . Would she have been the one that was auto-populated as the case manager?

A. Yes.

Q. And who is Alexis' supervisor?

A. It should be Morgan Obermiller.

Q. Okay. And is that your supervisor?

A. Yes.

. . . .

Q. Okay. As the caseworker that was assigned at the time of the dispositional hearing would you have had a hand in drafting those case plan goals and getting that report ready for the court to be able to get those orders?

A. I would.

Q. And these case plan court reports are they generated in the regular course of business with the department?

A. Yes.

. . . .

Q. And all of this information when received by the caseworker is uploaded into the N-Focus system?

A. Correct.

Q. And it's pulled from that system to generate the case plan court report?

A. Correct.

. . . .

Q. And again these case plan court reports are compiled and activities reported pursuant to department policies and procedures in your role as a caseworker?

A. Correct.

Q. Okay. And they're made in the regular course of -- the regular business practice of the department?

A. Yes.

Smith confirmed that she drafted the court reports from July 2023 to June 2024 (found in exhibits 10, 21, 29, 39, 44, 50), and that she did so in the regular course of business. Leeanna's counsel had the opportunity to cross-examine Smith about each of the court reports and case plans.

Although Leeanna takes particular issue with exhibit 62 (the case report and case plan "edited" by Smith), much of the information found in that exhibit is also found in the other court reports and case plans that Smith did author. Smith laid the foundation for the admission of the court reports and case plans, testified on behalf of the State, and was cross-examined by Leeanna's counsel. Furthermore, Smith laid appropriate foundation for the admission of the court reports and case plans pursuant to the hearsay exception for records. Taken together, these circumstances provide sufficient guarantees of trustworthiness to make consideration of the court reports and case plans fundamentally fair. See *In re Interest of Kassara M., supra.*

We note that the business records exception to hearsay does exclude "opinions and diagnoses." See § 27-803(6). However, the improper admission of evidence by the juvenile court in a parental rights termination proceeding does not, in and of itself, constitute reversible error; a showing of prejudice must be made. *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003). See, also, *In re Interest of Kassara, supra* (improper evidence in parental rights proceeding does not, in and of itself, constitute reversible error; as long as appellant properly objected, appellate court will not consider any such evidence in its de novo review of record.) In this case, Leeanna has not shown that she was prejudiced by the inclusion of "opinions and diagnoses" in the court reports and case plans. Moreover, several of the individual mental health providers personally testified at trial and were subjected to cross-examination by Leeanna's counsel.

### 3. GUARDIANSHIP

Leeanna claims that the juvenile court erred by failing to recognize that guardianship was a reasonable permanency alternative to terminating her parental rights. Neb. Rev.

Stat. § 43- 1312.01 (Reissue 2016) provides that when a permanency plan for a child does not recommend return of the child to his or her parent or that the child be placed for adoption, the juvenile court may place the child in a guardianship if certain elements are met. Among the required elements are § 43-1312.01(1)(b), that "[t]he child has been in the placement for at least six months," and § 43-1312.01(1)(d)(ii), that the guardian "[h]as made a commitment to provide for the financial, medical, physical, and emotional needs of the child until the child reaches the age of majority or until the termination of extended guardianship assistance payments and medical care pursuant to section 43-4511." The elements listed in § 43-1312.01(1) form a conjunctive list, each of which must be met before a guardianship may be established. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016).

Throughout this case, the permanency plan for Jackson and Shayla has been reunification or adoption. Only Jaden has ever had a permanency plan that recommended reunification with a concurrent plan of guardianship. At the time of the termination hearing, Jaden had been in his current placement for more than 6 months. However, when caseworker Smith was asked if Jaden's current placement was a viable option for a guardianship, she responded, "His placement has said that he is still on the fence but more so not going towards guardianship." Because Jaden's current placement had not made the commitment required by § 43-1312.01(1)(d)(ii), a guardianship was not a reasonable permanency alternative for Jaden at the time of the parental rights termination hearing.

### 4. STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Leeanna's parental rights to Jaden, Jackson, and Shayla under § 43-292(2), (6), and (7). The juvenile court found all three grounds existed by clear and convincing evidence.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the time the motion to terminate Leeanna's parental rights was filed on April 25, 2024, Jaden had been in an out-of-home placement for 17 months, and Jackson and Shayla had officially been in an out-of-home placement for nearly 16 months. Leeanna "does not contest that the State met its burden of showing that the minor children were in 'out of home' care for more than 15 out of the 22 most recent months." Brief for appellant at 35. We agree that the State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for termination in this case. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the other statutory bases for termination. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Leeanna claims, however, that the State failed to offer clear and convincing evidence to prove that terminating her parental rights was in the children's best interests, and that she is unfit to parent. We address best interests and unfitness next.

### 5. BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or

her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

(a) Jaden and Jackson

Leeanna, for the most part, has completed her court-ordered requirements. There is also evidence that indicates she loves her children, and they love her. Yet, this is the second juvenile court case involving Jaden and Jackson. Even after Leeanna achieved reunification in the previous court case, Jaden continued to struggle to the point that Leeanna arranged for Jackson and Shayla to essentially live full-time with Sarah. After the current juvenile court case was initiated, Jaden and Jackson continued to struggle. Both have had significant behavior issues, and their behaviors seemed to escalate after visits with Leeanna. The month prior to the termination hearing, Jaden had been hospitalized, and according to Simons, "part of the hospital's theory for him being there and feeling suicidal was because of his struggles with his visits at the family therapy with his mom." Additionally, Jackson was admitted to a psychiatric residential treatment program in June 2024 and remained there at the time of the termination hearing in September. And Leeanna had not, by the time of the hearing, provided the family therapist with reparation letters to the children, something the therapist believed was necessary for the therapy to progress.

By the time of the termination hearing, Jaden had been in an out-of-home-placement for 22 months, and Jackson had officially been in an out-of-home placement for nearly 21 months; although unofficially, Jackson had been in an out-of-home placement much longer. Smith testified that the termination of Leeanna's parental rights was in the children's best interests. We agree. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. The State proved that Leeanna was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *id.* We further find that there is clear and convincing evidence that it is in the best interests of Jaden and Jackson to terminate Leeanna's parental rights.

Shayla presents a different challenge regarding terminating Leeanna' parental rights. According to the evidence presented, Shayla does not struggle with significant mental health or behavior issues like her brothers. She has consistently had visits with Leeanna throughout these proceedings and their visits presented no safety concerns. However, at the time of the termination hearing, Leeanna was still only having supervised visits with Shayla for approximately 6 hours each week. We recognize that may have been due to an availability issue, rather than through some fault of Leeanna.

DHHS was concerned that Leeanna did not have appropriate housing should all three children return to her, but there is nothing to suggest that Leeanna's current living situation would not be suitable for Shayla individually. There were also concerns about Leeanna's ability to manage all three children together, but again, there was nothing to suggest that Leeanna was unable to manage Shayla individually.

According to Smith, terminating Leeanna's parental rights would be in the best interests of "all three" children. When asked if the permanency objectives for children are considered individually, Smith responded "[i]t is to a certain point," but that reunification and/or termination was "a package deal, basically." However, we note that this court has previously affirmed the termination of a mother's parental rights to some, but not all, of her children. See *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010) (juvenile court terminated mother's parental rights to her six children; after de novo review, this court concluded there was sufficient evidence to demonstrate that terminating mother's parental rights was in best interests of two children and that portion of juvenile court's order was affirmed; but this court concluded there was not sufficient evidence to demonstrate that terminating mother's parental rights was in best interests of other four children and that portion of juvenile court's order was reversed).

The record reflects that Leeanna and Sarah had an informal arrangement beginning in 2017 (when Shayla was a newborn), wherein Sarah helped care for Shayla for days, weeks, or even months at a time. Sarah stated that from the time Jackson started school in 2019 through December 2022, she was Shayla's primary caregiver, and Shayla lived with Sarah "with the exception of occasional visits" requested by Leeanna. According to DHHS court reports, Leeanna only had 2 overnight visits with Shayla in 2022. After the current juvenile court case began for Shayla in December 2022, Shayla remained out of Leeanna's home.

By the time of the termination hearing, Shayla was 7 years old and had officially been in an out-of-home placement for nearly 21 months, but unofficially, she had been in an out-of-home placement for most of her life. Throughout this case, Leeanna had approximately 6 hours of supervised visits with Shayla each week. It appears the individual visits with Shayla went well and the failure to increase visits may not have been entirely attributable to Leeanna. Nevertheless, even if Shayla's visits with Leeanna were to increase, there is no indication as to how long it would take to achieve reunification. Shayla has already been out of Leeanna's care for most of her life, and she should not continue to be suspended in foster care. See *In re Interest of Walter W., supra*. And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C., supra*. With regard to Shayla, it was not that Leeanna was necessarily unwilling to

rehabilitate herself within a reasonable amount of time, but rather that she was unable to do so. Accordingly, we find that the State proved that Leeanna was unfit and that there is clear and convincing evidence that it is in Shayla's best interests to terminate Leeanna's parental rights.

## VI. CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Leeanna's parental rights to Jaden, Jackson, and Shayla.

AFFIRMED.